**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARTEM MOLCHANOV, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VARONIS SYSTEMS, INC., YAKOV FAITELSON, and GUY MELAMED,<br><br>Defendants. | Case No. 1:26-cv-00117<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Artem Molchanov ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Varonis Systems, Inc. ("Varonis" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Varonis' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Varonis' common stock between February 4, 2025, and October 28, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning Varonis' expected annual recurring revenue ("ARR") for the fiscal year 2025. Defendants' statements included, among other things, confidence in the Company's ability to maintain ARR projections while converting both its federal and non-federal existing on-prem customers to the software-as-a-service ("SaaS") alternative offering.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Varonis' ability to convert its existing customer base; notably, that it was not truly equipped to convince existing users of the benefits of converting to the SaaS offering or otherwise maintain those customers on its platform, resulting in significantly reduced ARR growth potential in the near-term. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Varonis' securities at artificially inflated prices.

4.     On October 28, 2025, Varonis announced its financial results for the third quarter of fiscal 2025, disclosing a significant miss to ARR and reducing its projections for the full fiscal year 2025, despite previously uplifting guidance for the previous two consecutive quarters. The Company attributed its results and lowered guidance on weaker than expected renewals and

conversions in their federal and non-federal on-premises subscription business. Varonis further resultantly announced the end of life of the self-hosted solution and a 5% headcount reduction.

5.      Investors and analysts reacted immediately to Varonis' revelation. The price of Varonis' common stock declined dramatically. From a closing market price of $63.00 per share on October 28, 2025, Varonis' stock price fell to $32.34 per share on October 29, 2025, a decline of about 48.67% in the span of just a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Varonis was headquartered in this District during the instant class period and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Varonis' common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Varonis is attached hereto.

12.     Varonis Systems, Inc. was a New York corporation during the instant Class Period with its principal executive offices located at 1250 Broadway, 28th Floor, New York, NY 10001. On or around the first quarter of fiscal 2025, Varonis relocated its headquarters to 801 Brickell Avenue, Miami, FL 33131, yet the company has continued to maintain the previous New York headquarters location. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "VRNS."

13.     Defendant Yakov Faitelson ("Faitelson") was, at all relevant times, the Co-Founder, Chairman, CEO, and President of Varonis.

14.     Defendant Guy Melamed ("Melamed") was, at all relevant times, the Chief Financial Officer and Chief Operating Officer of Varonis.

15.     Defendants Faitelson and Melamed are sometimes referred to herein as the "Individual Defendants." Varonis together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Varonis' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.     Varonis is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Varonis under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.     Varonis is a global security company that provides software products and services to discovery and classify critical data, remediate exposures, and detect advanced threats with the help of AI-powered technologies.

20.     Varonis offers both on-premises and software-as-a-service ("SaaS") solutions, but at the end of the incident class period, announced a firm end-of-life date for its on-premises, self-hosted solution on December 31, 2026.

***The Defendants Materially Misled Investors Concerning***

***Varonis' ARR Outlook for Fiscal Year 2025***

<u>*February 4, 2025*</u>

21.     On February 4, 2025, Varonis reported its fourth quarter fiscal 2024 results and conducted a same day earnings call to discuss both the results and forward-looking projections.

22.     During the earnings call, Defendant Faitelson discussed Varonis' progress in converting on-prem users to the Company's SaaS offering, stating, in pertinent part:

> ***We still have many existing customers to convert to our SaaS platforms, but it is clear that we are well on our way to becoming a SaaS company***. Although we have started to realize some of the benefits of SaaS, there are so many more to realize once the transition is complete.
>
> For example, once we are fully transitioned to SaaS, our customers will enjoy greater level of security with much less effort, and we expect to see better retention rates. And over time, in market into which we can reaccelerate our upsell motion. This is a key reason why we plan to accelerate our transition time. And now we expect to complete it by the end of 2025, a year earlier than our previous outlook and 2 years earlier than our initial expectations.
>
> . . .
>
> ***While our existing customer convergence continue in a healthy way, during the fourth quarter, this convergence are time and resource intensive***. We believe our sales efficiency and ability to drive growth from our base will actually accelerate post transition once our reps are able to focus on SaaS upsell and cross-sell rather than converting self-hosted customers.

(Emphasis added).

23.     Defendant Melamed reiterated the company's positivity toward conversions while also highlighting the financial impact of them, noting, in pertinent part:

> ***Conversions of self-hosted customers were also very strong because customers see the value of SaaS and MDDR, which help customers achieve their goal with very little effort as we do almost all of the work for them***. At the same time, these conversions require a lot of effort due to legal and procurement work, and SaaS security checklist requires to get customers to convert to SaaS from self hosting. ***Despite the healthy uplift we recognize upon conversion***, the amount of time spent

on this part of the sales cycle is greater than a traditional upsell or cross-sell. In addition, our growth for many years was driven by upsells. And until we convert customers to SaaS, the upsell motion is on hold. This means that conversions are dilutive to sales efficiency during the transition and serve as a headwind to our ARR growth and expansion motion when compared to historical levels.

(Emphasis added).

24.     Defendant Melamed further highlighted the Varonis' guidance for fiscal 2025, providing, in pertinent part, the following:

> For the **full year 2025, we expect ARR of $737 million to $745 million, representing growth of 15% to 16%;** free cash flow of $120 million to $125 million; total revenues of $610 million to $625 million, representing growth of 11% to 13%; non-GAAP operating income of $0.5 million to $10.5 million; non-GAAP net income per diluted share in the range of $0.13 to $0.17. This assumes 137.5 million diluted shares outstanding.

25.     The question-and-answer portion followed, during which Defendants emphasized their confidence in continuing to convert on-prem customers to the SaaS offering as articulated in the following pertinent exchanges:

> <Q: Michael Steven Richards – RBC Capital Markets – Senior Associate> This is Mike Richards on for Matt. And congrats on the results and the accelerated time line here. Maybe if we're sitting here a year from now and we're talking about upside to that flat net new ARR growth, could you talk about maybe where there might be some conservative assumptions around either Copilot uptake or conversions of the base? And how are you accelerating that Phase 2? Is that going to be through a care and stake approach? Or are we looking at sales incentives? Just any detail on that would be great.
>
> . . .
>
> <A: Guy Melamed> **In terms of the conversions, we saw a lot of success in 2024 converting our existing customers to SaaS. And during the process of doing so, we learned a lot. So when we look at those learnings, we're making some strategic investments in sales and customer success, support and legal to support the transition, and we really plan to start our renewal process even earlier this year to allow for more time to process the additional paperwork associated with moving to SaaS**. So overall, we feel very good about the opportunity to accelerate our SaaS transition and enable our company to realize the benefit of SaaS a year earlier than our previous expectations and 2 years earlier than our initial plan.

. . .

<Q: Hamza Fodderwala – Morgan Stanley – Equity Analyst> I'm a little confused by your earlier comments on the renewal process. Are you talking about pulling forward renewal deals? So that way, you can get more conversion to SaaS from the existing customer base? And then just more on a high level, it seems like you're going to be down with the SaaS transition, spend this year are largely complete. That's 2 years ahead of your initial plan. But as we think about the durability of this mid-teens growth, right, once you surpass this transition broadly, how do we get confidence in the ability to sustain that? Is it going to come from more momentum on the AI front? Is there sort of another product cycle that you're quite confident about? Because I think that's really 1 of the key areas investors are focused on.

<A: Guy Melamed> *So first of all, in terms of the renewals, we're talking about the actual renewals that expire within the year. We want to make sure that we're ahead of the game, and then we're talking to customers about the benefits of SaaS. It's a no-brainer for them to move.* But sometimes, there's additional paperwork that is part of the process. And obviously, when you move from on-prem to SaaS, it's a different checklist from a security perspective.

*So there's a lot of documentation. It's not a technological challenge. It's more of a documentational challenge that we want to be ahead of. And that's why we want to start the conversation with customers that are about to renew earlier than what we did last year. So that kind of takes care of that component.*

. . .

<Q: Brian Lee Essex – JPMorgan Chase & Co – Executive Director of U.S. Software Equity Research> And great to see the reacceleration of customer growth here. I guess on that, either Guy or Yaki, I think we've previously talked about Phase 1 versus Phase 2, and Phase 2 being kind of the stick phase where you push customers or incentivize them a little more aggressively to convert. Could you help us understand as you're pursuing more aggressive incentives to bring customers over to the SaaS platform, how should we get comfortable or how do investors get comfortable that you won't see accelerated attrition from the platform? And what are those conversations like? I think you talked about learnings from what you've seen over the past year or so. But how can we kind of maybe get some -- a little bit of insight from those learnings to get us comfortable for durability of the customer base on your platform?

<A: Guy Melamed> *So we definitely took a lot of the learnings from our previous transition. And I can tell you that one of the things that we have put at the forefront of everything we do is the benefit for the customer and how -- what is better for them.* And one of the things that we're seeing is that the SaaS product is by far a better product for them, gives them better protection. And the MDDR offering is not there with the on-prem subscription. It's only there with the SaaS

offerings, and it allows us to do a lot of the work for them and make sure that our -- our platform is the one that's provided in an automated way, a lot of those benefits.

So when we think about kind of the move, ***we want to make sure that we do it in the right way. And with that customer and kind of the way we're thinking about it, we've also -- for 2025, made sure that from a commission perspective, we're incentivizing our sales team on the conversions without neglecting new business***. So the new business is at the forefront of everything, but we're absolutely making sure that it's in everyone's best interest, and it's a win-win to make sure that they -- we complete the transition in 2025.

. . .

26.     Additionally, Defendants pushed back against the notion that they were having difficulty converting existing users to the SaaS alternative in response to the following pertinent inquiries:

<Q: Brian Lee Essex> That's helpful. I mean, ***have you seen resistance from customers?*** Or is it a lack of resistance that maybe gives you confidence that you can maybe go more aggressively about converting them to the SaaS platform and MDDR?

<A: Yakov Faitelson> As you can see, it moved much faster than we thought. And the MDDR is such a strong offering and all the remediation automation that we have in the cloud and value is everything customers get value frictionless way, then you can expand. And you see all these massive data stores and almost every big breach is a data breach. This is what organization wants to avoid. You go to a CISO today, we'll tell you, you want to make sure you don't have a data breach, to make sure I don't have compliance time and I want to make sure of doing this in an effortless way with a relatively lean team. And this is what we are doing for them. ***But in order to do it, we need to do it in the cloud. This is why we just put -- we are accelerating it. We want to make sure that we are adding value to all of our customers, and in order to do that, they need to be in SaaS.***

. . .

<Q: Joel P. Fishbein -- Truist Securities, Inc. -- MD of Software and Cloud Technology> Guy, just for you. I'd love some more color and if you can quantify it in any way, the backlog that you currently have and how the pipeline is? I understand you're having some challenges via the conversions, but I just want to understand the health around that pipeline and the backlog?

<A: Guy Melamed> ***I wouldn't say that. When we talk about the conversions, I think they're weighing on the growth when you look at kind of the new business***

*behavior. But I wouldn't say that it's not something that we can deal with.* When you look at the pipeline, we have a healthy pipeline. *We have a lot of conversations with our existing customers on the conversion to SaaS. We're trying to start the process, as I mentioned before, earlier than what we would otherwise. And I think in terms of setting ourselves up for 2025, we feel very good with where we are today, both on the new customer side and on the existing customer conversion.*

. . .

<Q: Roger Foley Boyd – UBS Investment Bank – Analyst> Guy, I wanted to come back to conversions. And I get the dynamic there of wanting to focus on that conversion now and the increased effort required to sell that conversion. But it's like a couple of quarters ago, there was more optimism around attaching more of the platform at the time of conversion. I guess am I getting that right? And if so, have you seen any change to that ability to attach more of the platform? Or conversely, has there been any change to how you're pricing those SaaS conversions?

<A: Guy Melamed> No, we don't see any change in terms of the pricing. *We're seeing healthy uplift on the conversions themselves. We talked a lot about the fact that the price list of SaaS is 25% to 30% higher than the on-prem subscription. We're seeing very healthy conversions in terms of pricing. We feel good about the ability to convert our customers.* But keep in mind, we only announced the transition 2 years ago at the beginning of 2023, and we're already at 53% SaaS of ARR.

So when you think about the magnitude and the dollar value that's involved in order to get so many of our customers to SaaS, you have to take that into consideration. 53% getting to the majority of our ARR coming from SaaS within 2 years is something that we feel very proud of. And if -- and with our decision to kind of complete the transition in 2025, if we can execute the way we believe we can, we'll be completing the transition in 3 years. That's 2 years quicker than what we initially thought and a year shorter than kind of what we talked about a year ago.

*So we're very pleased with our ability to convert.* The pricing is holding very well. We feel that once we convert our customers, there's an additional opportunity to sell them more platforms. It's in their benefit to move to SaaS, they'll be better protected and it's also better for us. So it's a win-win for everyone. And that's why we're still happy with that with where we are so far, and we're very optimistic with going into 2025.

(Emphasis added).

*May 6, 2025*

27.    On May 6, 2025, Varonis conducted its first quarter fiscal 2025 earnings call, during which Defendant Faitelson spoke positively about the Company's ability to convert its existing on-prem client base, stating, in pertinent part:

> We also continue to see very healthy customer interest in safely deploying Copilot and other generative AI tools, which is serving as a reason for new customers to engage with Varonis and ***also for existing ones to convert to our SaaS platform. We see massive opportunity to increase the ARR from our existing customer base*** and in the first quarter we continue to see existing customers expand their deployment and increase their spend with us. Varonis SaaS is a no-brainer for our customers because of the value that it offers.
>
> ***In the first quarter, we were able to convert existing customers to SaaS more effectively because of the lessons we learned last year and the additional investments that we made in our team***. This is now also freeing up capacity of our sales teams. They are bringing in healthy levels of new customers while also upselling additional platforms to our broader customer base.
>
> . . .
>
> While new customers drove most of our momentum this quarter, ***we are also seeing strong demand from existing customers looking to convert to our SaaS platform and expand their protection to cover new critical cloud data stores*** I mentioned a few moments ago.

(Emphasis added).

28.    Defendant Melamed, for his part, reiterated much of the same positivity and pertinently highlighted Varonis' increased full-year guidance, stating:

> Our Q1 results demonstrate sustained new customer momentum ***and that the investments we made in our team and lessons we learned regarding existing customer conversions is working***.
>
> . . .
>
> Turning now to our updated 2025 guidance in more detail. Our acquisition of Cyral is not expected to have any impact on ARR or revenue this year and is expected to add approximately $4 million of operating expenses in 2025. For the second quarter of 2025, we expect total revenues of $145 million to $150 million, representing growth of 11% to 15%. Non-GAAP operating loss of negative $5 million to

negative $2 million and non-GAAP net income per diluted share in the range of $0.00 to $0.01. This assumes 135.2 million diluted shares outstanding.

***For the full year 2025, we now expect ARR of $742 million to $750 million, representing growth of 16% to 17%.*** Free cash flow of $120 million to $125 million. Total revenues of $610 million to $625 million, representing growth of 11% to 13%. Non-GAAP operating income of $0.5 million to $10.5 million, non-GAAP net income per diluted share in the range of $0.14 to $0.17. This assumes 135.8 million diluted shares outstanding.

(Emphasis added).

29.     In the question-and-answer segment that followed, Defendant Melamed

highlighted the strength of the Company's conversions during the following pertinent exchange:

<Q: Joseph Anthony Gallo – Jefferies LLC – Senior Enterprise & Security Software Analyst> Last quarter, you mentioned elongation of conversion cycle times. Has that length of cycle time for conversions changed in any way? And then how is the gross retention rates in ASP upside recognized again for those customers?

<A: Guy Melamed> ***This to a lot of lessons that we have learned from the conversion process last year, and we are trying to implement them starting this year. I think we've done a very good job. And when you look at kind of the conversions that we had in Q1 they were really strong. And I think all of the investments and the lessons learned were implemented in a way that we're happy to kind of to start the year with.***

When you look at the gross retention rate, when you look at the renewal rates, they're all very strong. We feel good about where we are and what we're seeing. And we talked a lot about the fact that SaaS is purely a better product and therefore, ***we're seeing our existing customers try it and then want to buy more and be better protected.***

But really when -- it's important to note that the conversions weren't the only strong element this quarter and we're definitely seeing strong new customer adoption. Again, it kind of relates to that SaaS platform that is being -- the offering is so much better. So when you look at kind of the growth rate and our ability to get to that acceleration is coming from our existing customers buying more and our new customers that were really strong this quarter.

(Emphasis added).

30.     Later in the Q&A, Defendant Melamed spoke to the federal conversion rate,

highlighting that the third quarter is the largest quarter for Varonis' federal business contribution:

<Q: Shaul Eyal – TD Cowen – MD & Senior Analyst> Yaki, I wanted to ask fairly two little quick questions. One, what's the headcount that you're adding with the small -- with the stocking acquisition? And a macro, Guy or Yaki, DAG specifically -- I'm not talking about tariffs, et cetera, but DAG specifically, have you seen anything emerging in this quarter?

<A: Guy Melamed> I'll start with the second question, and thanks for that, Shaul. **When we look at federal and I want to remind everyone, the federal business for us is still relatively small, about 5% of total company ARR. And when we look at kind of the -- when we look at the contribution in Q1, Q1 is not considered a large quarter for them. Their largest quarter is Q3.**

So when you think about kind of how we look at federal, we didn't see anything kind of evolved from DAG and the way we think about it from a guidance perspective is that we didn't assume any significance contribution in comparison to last year. So **we are very happy with kind of the progress of the FedRAMP certification. It's really as progressing as planned, and we hope to get it in the next few months. So we definitely believe in that long-term opportunity in that vertical. So that kind of relates to the federal question.**

(Emphasis added).

*July 29, 2025*

31.      On July 29, 2025, Varonis issued its press release reporting second quarter results. During the same-day earnings call, Defendant Faitelson again highlighted the "strong demand" for Varonis' SaaS platform from "both new **and existing** customers, primarily due to the superior experience that Varonis SaaS and MDDR offers," further noting that Varonis "again saw strong demand from existing customers looking to convert to our SaaS platform."

32.      Defendant Faitelson further highlighted Varonis' federal authorization, stating, in pertinent part:

> **I'm also proud to announce that we achieved the FedRAMP Authorization, enabling us to offer our entire SaaS platforms to the federal sector. Demand from both new and existing customers looking to protect cloud environments with Varonis continue to positively inflect and is becoming a material contributor to our business**.

> This is driven by the investments we have made in our platform to expand our use cases, going wider and deeper and entering new markets, including DSPM, our

ability to protect cloud data represents a significant untapped growth opportunity for us *and transitioning our customers to our SaaS delivery model is helping us unlock this market's potential*.

33.     Defendant Melamed then highlighted the Company's updated fiscal 2025 guidance, pertinently providing the following:

> Turning now to our updated 2025 guidance in more detail. For the *third quarter of 2025, we expect total revenues of $163 million to $168 million, representing growth of 10% to 13%*. Non-GAAP operating income of $4 million to $7 million and non-GAAP net income per diluted share in the range of $0.07 to $0.08. This assumes 134 million diluted shares outstanding.
>
> *For the full year 2025, we now expect ARR of $748 million to $754 million, representing growth of 17%.* Free cash flow of $120 million to $125 million, total revenues of $616 million to $628 million, representing growth of 12% and to 14%. Non-GAAP operating income of breakeven to $6 million, non-GAAP net income per diluted share in the range of $0.16 to $0.18. This assumes 134.7 million diluted shares outstanding.

34.     During the question-and-answer period that followed the Defendants prepared remarks, Defendants discussed their expectations with regard to converting federal on-prem clients to the SaaS offering during the following pertinent exchange:

> <Q: Brian Lee Essex – JPMorgan Chase & Co. – Executive Director of U.S. Software Equity Research> Yaki, maybe a question for you. Great to see the FedRAMP Authorization. I would love to get your sense of how you feel positioned ahead of the stronger third quarter for fed spending how much visibility you might have into that Fed business? And what's your sense of the preparedness on the Fed side to adopt data security versus what you're seeing on the enterprise side?
>
> <A: Guy Melamed> So I'll start and then Yaki can add some stuff.
>
> Obviously, we were very excited to receive the FedRAMP Authorization this quarter. It really is a great milestone for us. *We can now offer the SaaS platform to the federal sector, and that's really a big deal from our end. Our team put a lot of time, effort and investment into this achievement. And we know there's a significant white space for us in the federal vertical*. But I do want to remind everyone, the federal is still about 5% of our total company ARR.
>
> It really is still too early to say if we can have any benefits from the FedRAMP in our Q3 results this year. But *from a guidance perspective, we assumed a similar*

*contribution to last year. On the longer-term side, we see a huge opportunity in this vertical.*

<A: Yakov Faitelson> It's very easy. There is a lot of critical information. We show a lot of critical information about you as well. And the way that it works and you see a lot of bad actors and state actors many times.

So this is data that they need to protect. You just now what happened with the SharePoint vulnerability and so forth. We just -- it's all about data. And I want to say another thing. ***FedRAMP, it's not only important for federal customers. When you are a data security company, even though we don't take critical data to our SaaS but it was very important to demonstrate it for many customers on the commercial side, FedRAMP is critical, it is certificate that it take security very seriously that you're under the right audits that you have the right controls and it was very important for us to do this exercise.***

We are taking the security of our platform. extremely, extremely seriously. We want to make sure that once we are protecting your data, we are all the time secured. And definitely, on the data security these days from all the DSPM space, we are the only one with FedRAMP.

(Emphasis added).

35.     The above statements in Paragraphs 21 to 34 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Varonis' optimistic reports of growth, cost cutting measures, and overall effectiveness of its sales team to continue to convince existing clientele to convert to the SaaS offering fell short of reality; Varonis was simply ill-equipped to continue its ARR growth trajectory without maintaining a significantly high rate of quarterly conversions.

### *The Truth Emerges during Varonis' Third Quarter Earnings Report*

#### *October 28, 2025*

36.     On October 28, 2025, Defendants released their third quarter results well below their previous projections and resultantly lowered their full-year guidance, pertinently as follows:

**Financial Summary for the Third Quarter Ended September 30, 2025**

- Total revenues were $161.6 million, compared with $148.1 million in the third quarter of 2024.
- SaaS revenues were $125.8 million, compared with $57.8 million in the third quarter of 2024.
- Term license subscription revenues were $24.8 million, compared with $68.8 million in the third quarter of 2024, with the vast majority of the decline driven by customers converting to our SaaS platform.
- Maintenance and services revenues were $10.9 million, compared with $21.5 million in the third quarter of 2024, with the vast majority of the decline driven by customers converting to our SaaS platform.
- GAAP operating loss was ($35.9) million, compared to GAAP operating loss of ($23.6) million in the third quarter of 2024.
- Non-GAAP operating income was $0.2 million, compared to non-GAAP operating income of $9.1 million in the third quarter of 2024.

. . .

**Financial Outlook**

We are reducing our full-year ARR guidance to account for the underperformance of our on-prem subscription business in the final weeks of the third quarter. To account for this recent change as well as our decision to end of life our self-hosted solution, we have assumed an even lower renewal rate in our on-prem subscription business for the fourth quarter.

For the fourth quarter of 2025, the Company expects:
- Revenues of $165.0 million to $171.0 million, or year-over-year growth of 4% to 8%.
- Non-GAAP operating income of $0.0 million to $3.0 million.
- Non-GAAP net income per diluted share in the range of $0.02 to $0.04, based on 133.4 million diluted shares outstanding.

For full year 2025, the Company now expects:
- ARR of $730.0 million to $738.0 million, or year-over-year growth of 14% to 15%.
- Free cash flow of $120.0 million to $125.0 million.
- Revenues of $615.2 million to $621.2 million, or year-over-year growth of 12% to 13%.
- Non-GAAP operating loss of ($8.2) million to ($5.2) million.
- Non-GAAP net income per diluted share in the range of $0.12 to $0.13, based on 134.8 million diluted shares outstanding.

37.     In the earnings release, Defendant Faitelson further elaborated on the reasons for the shortfall, attributing it to the "final weeks of the quarter" where Varonis "experienced lower renewals in the Federal vertical and in our non-Federal on-prem subscription business, which led to a shortfall relative to our expectations."

38.     During the corresponding earnings call, Defendant Faitelson highlighted Varonis' disappointing results and the reason for the full-year projection reduction, stating, in pertinent part:

> In February, on our first quarter earnings call, we noted that Varonis is a story of 2 companies, and this remains true today. Our SaaS business, it drives our momentum as SaaS customers benefit from the simplicity and automated outcomes of the platform and our on-prem subscription business, the drag on total company ARR growth and masks the strength of our SaaS business.
>
> Let's start by reviewing our third quarter results. ARR increased 18% year-over-year to $718.6 million. ***However, in the final weeks of the quarter, we experienced weaker-than-expected renewals in our federal business in our non-federal on-prem subscription business, which resulted in Q3 coming below our expectations***. As a result of continued underperformance in the federal vertical, we will be reducing the size of the team until we see improvement.
>
> ***Now that we have completed our SaaS transition, we are now announcing the end of life of our self-hosted solution as of December 31, 2026***. We expect this to result in increased uncertainty with our remaining OPS business going forward. In each of the first 2 quarters of this year, we saw improvement in our gross renewal rate across the business, which is why the reduction in the renewal rate that happened in the final weeks of Q3 was unexpected.
>
> ***To account for this recent change as well as our decision to end of life our self-hosted solution, we are baking in additional conservatism to our guidance and have assumed even lower renewal rates in our OPS business for the fourth quarter***. We are also taking thoughtful and prudent steps to manage expenses across the business, which ***includes a 5% reduction in headcount*** in order to reallocate our resources where we see the highest return on investment.

(Emphasis added).

39.    Defendant Melamed elaborated more particularly as to the financial details of the

setback and the reduced guidance, pertinently providing the following:

> As Yaki mentioned, we see Varonis as 2 companies: our healthy SaaS business which now represents 76% of our total ARR or approximately $545 million, and our on-prem business, whose weaker performance is masking the underlying growth of SaaS in total company results.
>
> I will expand on this shortly, but let me first recap our Q3 results and update guidance. In the third quarter, ARR increased 18% year-over-year to $718.6 million. Our quarterly results did not meet our expectations due to weaker-than-expected renewals in our federal and nonfederal on-prem subscription business in the final weeks of the quarter.
>
> In each of the first 2 quarters of this year, we saw an improvement in our gross renewal rates across the business, which is why the reduction in the renewal rate in the final weeks of Q3 was unexpected. Since it is unclear if this reduction is specific to the customers that were up for renewal in Q3 or will be applicable to the population of remaining on-prem subscription customers, we have assumed a lower renewal rate in the fourth quarter and expect continued variability in our on-prem renewal rate going forward.
>
> As it relates to our guidance, we are now baking in additional conservatism for the fourth quarter to account for our weaker Q3 results and the decision to end of life our self-hosted solution. At the same time, our SaaS business remains very healthy, even when excluding the impact of conversion, and we continue to see the SaaS NRR trend at very healthy levels.
>
> . . .
>
> Turning now to our updated 2025 guidance in more detail. For the fourth quarter of 2025, we expect total revenues of $165 million to $171 million, representing growth of 4% to 8%. Non-GAAP operating income of breakeven to $3 million and non-GAAP net income per diluted share in the range of $0.02 to $0.04. This assumes 133.4 million diluted shares outstanding.
>
> For the full year 2025, we now expect ARR of $730 million to $738 million, representing growth of 14% to 15%. Free cash flow of $120 million to $125 million. And total revenues of $615.2 million to $621.2 million, representing growth of 12% to 13%. Non-GAAP operating loss of negative $8.2 million to negative $5.2 million. Non-GAAP net income per diluted share in the range of $0.12 to $0.13. This assumes 134.8 million diluted shares outstanding.

(Emphasis added).

40.     During the question-and-answer segment that followed, Defendants detailed the

potential inability to convert some of its existing on-prem users to the SaaS offering and how that

impacted Varonis' projections during the following pertinent exchanges:

<Q: Joshua Alexander Tilton – Wolfe Research, LLC – Senior Vice President> Maybe just one for me. And the answer might be you guys are still kind of trying to figure it out. But, I guess, I'm listening to everything that's going on the call, and I'm just -- I understand what happened in the quarter, but I'm still a little confused on the why. Like do we -- like from your perspective and like what happened, what was the reason as to why you saw some of these lower-than-expected renewals in the on-prem business, both for Fed and non-Fed?

And my follow-up to that, maybe just a little more directly is on the Fed side, was it related to the shutdown? And on the non-Fed side, were these customers aware that the end of life was going to happen? Or is this announcement of end of life kind of post quarter, if that makes sense?

<A: Guy Melamed> . So really, ***as it relates to this quarter, we really saw multiple factors that came up, but we didn't identify any big theme that relates to our customers that did not renew on the on-prem subscription renewals.***

***I think we identified sales process issues on the convergence that weren't related to the contracts and the documentations that we've talked a lot about in the past, and we are going back to basics to address these issues. We also identified and we are seeing some additional budgetary scrutiny from customers this quarter. But it's really hard to say for certain if that was a factor because it happened so late in the quarter***.

And obviously, as you mentioned***, we had the federal underperformance***. I can tell you that one thing that was clear to us is that we didn't see a change in the competitive win rates, and we're still in discussions with some of these customers that did not renew.

<A: Yakov Faitelson> And with some of them, it was clear that they were what we call single threaded that did some classification and audit and didn't do all the find, fix, alert methodology. ***And in some cases, the teams just -- the heart of the sales process is a POC and then QBR that showed the value and an EBC that showed everything that we have in terms of road map and so forth and some teams didn't really follow this methodology.***

And also, ***it's a tale of 2 companies, but the vast majority is now in SaaS. And for some of the teams, it's easier to pay attention to the SaaS customers, and we want to make sure that we are managing their attention and making sure that we are taking care of this last leg of the transition in the right way***.

. . .

<Q: Rudy Grayson Kessinger – D.A. Davidson & Co. – MD & Senior Research Analyst> It's kind of been asked. But I'm just curious, the end of life for self-hosted by the end of next year, and you just had lower renewal rates than you were expecting in Q3. I mean, do you feel at all that this push to migrate to SaaS is in any way alienating a certain portion of your customers who are just never going to move to SaaS?

And if so, I guess, why do that? I imagine some of those customers might be very large strategic customers who could have very high lifetime values. Why not let them have a longer time frame to migrate to SaaS or remain on term license if they want to?

<A: Yakov Faitelson> So we wanted to move everybody to SaaS and we said -- and get rid of the OPS. We always say that it's 10% of the effort and order of magnitude, 10x more value. Just as a business to operate it, everything that we are doing with engineering and the value that customers are getting, the integration of all our products, the way that we provide support.

You need the right platform, then you need the right business model and the right operating model. ***And all along, the whole thought process was to move to 100% SaaS business. And we just want to also make sure that we are accelerating it because we also believe that in terms of the attention because this is one of the most important ingredient of our salespeople***.

We want that their attention will be on getting value to customers, selling more DA Cloud that is doing very, very well this year, selling the SlashNext product, the database activity monitoring, and we are doing so many more. And we just want this low-touch support model and MDDR and provide all the automations and the whole operating and business model of the company and also the value proposition is geared towards us.

<A: Guy Melamed> Add to that, just when you go back to our Investor Day that we held in Q1 of 2023, we defined a transition to be complete when we get anywhere between 70% to 90% of our ARR coming from SaaS. This is actually the first quarter that we are above that 70% threshold, finishing at 76%. And if you go back to conversations that we've had, we always said that we don't want to maintain 2 types of code, that there are a ton of financial benefits for the organization to be only under SaaS.

***And as Yaki mentioned, there's obviously a tremendous difference in value provided to customers that are SaaS versus customers that are on the on-prem subscription. So if you look at the benefits for the customers and if you look at the financial benefits for the organization, we don't want to be stuck between the***

***on-prem subscription business and the SaaS business, SaaS business performing really well.***

And obviously, the on-prem subscription renewals acting the way they did in Q3. So that's -- we would have announced the end of life. ***That was our plan all along. But obviously, with what we see in Q3, we kind of expedited that announcement***, but really talking about December -- end of December of next year. And we will work with our customers to make sure that they can move to SaaS and benefit from it.

But as we mentioned all along, we didn't want to maintain 2 types of code, and there are significant financial benefits for the organization, not maintaining those 2 types of on-prem and SaaS and being just on SaaS.

<A: Yakov Faitelson> And also the ability of our sales force to do effective account management to take care of our customers in the right way. The whole company now, the lion's share is a SaaS business and gear...

. . .

<Q: Roger Foley Boyd – UBS Investment Bank – Analyst> was there any change to how you're approaching renewals on maintenance and term license in the quarter relative to the second quarter or last year and whether that maybe led to some of this unpredictability.

I guess, the context is we had heard some anecdotes that you were maybe more heavily encouraging on-prem customers to move to SaaS or in some cases, living in the ability for customers to renew on maintenance. And just wondering if that at all was informed by this planned end-of-life on-prem business.

<A: Guy Melamed> So again, going back to kind of the reasons for the lower renewal rate of the on-prem subscription, we just saw multiple factors. I don't think there was any one big theme that we can pinpoint to the reason of the on-prem subscription renewals behaving the way they were, especially when you look at the Q1 and Q2 renewal rates where the -- when you look at the renewal rate of the company going up in Q1 and Q2, we definitely didn't expect that the Q3 renewals of the on-prem subscription would behave that way.

I think that when you go back -- if you go back historically, our sales force has been trying to convert customers in discussions with our customers for -- since we announced the transition. We were able to move as quickly as we have because our reps were discussing this with customers. ***We obviously believe that the benefit of having SaaS and MDDR has much greater value for our customers than being on the on-prem subscription and then having those customers manage the platform themselves.***

So obviously, I don't know what you heard, but our sales team has been working with customers, and we'll continue to work with our customers to make sure that they get the best platform that we have to offer, which is the SaaS plus the MDDR and all the functionalities that we have under SaaS that we don't have with the on-prem subscription.

I think that as we look at the results in Q3, we see a very healthy business under the SaaS platform. And obviously, the on-prem subscription acted in a way that surprised us, which is part of the reason that we want to be 100% SaaS by the end of next year. So this -- I don't see this as something that is different in Q3 compared to Q2.

***I think there were multiple factors that contributed to kind of the lower renewal rate of the on-prem subscription. We talked about the sales process issues. We talked about additional budgetary scrutiny. Obviously, we talked about the federal underperformance***. But as I said before, there was one thing that was clear to us, and that was that we didn't see a change in the competitive win rates, and we're still in discussions with some of those customers that didn't renew.

So we think we might be able to get some of them back. We're in discussions with them. But obviously, we -- from a guidance perspective, we're assuming a more conservative guidance for Q4 because of the rates that we saw in Q3.

. . .

<Q: Jason Noah Ader – William Blair & Company LLC – Partner & Co-Group Head of Technology, Media and Communications> So if customers are not renewing their on-prem subscriptions with Varonis, then what are they doing? Because obviously, you wouldn't think they'd want to be exposed if they've had Varonis data protection and all of a sudden, they don't have access to the technology anymore.

So maybe just talk us through that, like what are they doing? And then separately, is term -- is there an element of compression in term contract duration at all because we saw that with another software company this morning where they saw some compression in term duration.

<A: Guy Melamed> So let me address the first question and then I'll tackle the second one. When we look at those on-prem subscription renewals, most of them didn't go anywhere. And as I said before, we're in discussions with some of them. ***For many of these customers, they were single threaded, meaning they were only protecting on-prem data with a single use case, and they weren't using the full platform that we have with our SaaS offering. Historically, we converted these customers without many challenges***.

22

*But in Q3, we encountered some of these issues and really can't really tell if it was a one-off or a new trend. And that's part of the reason that we want to see how Q4 behaves in order to get more color on kind of the rest of the non-SaaS business*. In terms of the duration, that wasn't an impact here. We looked at that and analyzed that, and it didn't have an impact.

<Q: Michael Joseph Cikos – Needham & Company, LLC – Senior Analyst> I'm trying to get a sense if there was anything unusual about this OPS renewal cohort in the final weeks of the third quarter. And really, what I'm trying to get at is I'm wondering if the renewal rates was really tied to a smaller subset of customers, i.e., the breadth of customers really skewed to the renewal rates that we're talking to.

And does that in any way help explain why the team is uncertain on the impact of these renewal rates, maybe just because we don't have enough observed data points. And then, I guess, secondly, have the OPS renewal rates that we saw on those final weeks of Q3? Have they persisted in the 4Q now that we have October, essentially behind us? I'm just trying to get a sense of what's transpired in the following 4 weeks.

<A: Guy Melamed> So let me touch on the second part of the question. And I think I -- my understanding is -- are we seeing any trends in Q4 on the renewal rates. I think it's important to note, and we've disclosed this in our SEC filings, our business is back-end loaded, and we closed a significant portion of our business in the last 3 weeks of the quarter.

*It's very hard to see how the renewal rate will behave in Q4 when you own the data points that we have sitting here today. And if you go back to Q3, the business was tracking on plan, but really it was only in the final 2 weeks of the quarter that we experienced a decline in our renewal rate for the on-prem subscription business, which related really to both the federal and nonfederal sectors. So it's very hard for us to bake in any assumptions.*

And from a guidance perspective, we have never baked in positivity before we see it come to fruition. We always assume either the trend continues or gets worse, which is what we did in this case of the guidance. *In our Q4 guidance, we assumed lower renewal rates that would take into consideration not just what we saw in Q3, but some of the impact of the announcement of end of life for our on-prem subscription business.*

So that was the thought process there when we looked at the Q4 numbers. And obviously, as we see the results at the end of the quarter, we'll give additional color from all the analysis that we'll see and kind of look at 2026 with the lens of Q3 and Q4 and not just based on Q3 as one data point.

<A: Yakov Faitelson> There's no one thing. *There is no one plan. But in some cases, definitely, there are account -- basic account management problems that*

*customers use a small subset of the platform and our reps assumed like in other situation, they automatically will move into SaaS for the full hybrid complete.* They had some positive discussions, but because of the limited usage and some deals [indiscernible] just all over it to make sure that we are getting control over these situations.

41.     Defendants further discussed impacts to the federal on-prem business specifically

during the following pertinent exchanges:

<Q: Meta A. Marshall – Morgan Stanley – Vice President> Maybe a question for me is just in terms of kind of you guys had just received FedRAMP high authorization for the SaaS platform. And so I guess just what went into kind of some of the decision to kind of terminate some of the people on the federal team. And just how do you kind of pursue that opportunity going forward?

<A: Yakov Faitelson> We have the FedRAMP moderate, but we just don't have just the empirical evidence that in terms of when we're looking at all of the investment, this is the place that we need to invest in. *We said all along that it doesn't behave like the enterprise business. And we haven't figured out why the federal continued to underperform. It's just the result, we are reducing the footprint of our federal team and just grouping and reevaluating the strategy there*.

. . .

<Q: Erik Loren Suppinger – B. Riley Securities, Inc. – Research Analyst> Just can you remind us what your contribution from Fed was and maybe what the contribution from the on-premise Fed business because I think all the Fed is probably on-premise. And then you've specifically identified both your Fed on-prem and the non-Fed on-prem. Was there a difference in terms of the decline in renewal rates between those 2 categories? Or were they both down similarly?

<A: Guy Melamed> So federal business has always been around 5% of our total ARR. *And when we look from a guidance perspective going into Q3, we basically assumed a flat contribution going into the quarter, but we actually had a headwind related to the federal business that was really coming from the renewals in the federal business.* And we had *several million dollars of a headwind coming from the federal business*, which is kind of why we're making the adjustments to the team.

But when you look at the renewals, there were actually -- *the renewal rate decline was both on the federal side and also on the nonfederal side, which is the reason that we're reducing our Q4 numbers. If it was only the federal, I don't think we would have adjusted the full year guidance the way we did*.

(Emphasis added).

42.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 4, 2025, May 6, 2025, and July 29, 2025, earnings calls. On those calls, Defendants continually praised the benefits of their SaaS offering and their ability to convert existing on-premises users to the SaaS offering and emphasized the key third quarter potential for the conversion of federal users in particular, repeatedly increasing their fiscal 2025 ARR guidance on the back of such statements, while continually minimizing risks associated with consumer budgetary constraints, salesforce execution, and the general impact of the macroeconomic environment on both its federal and non-federal on premises clientele.

43.    Investors and analysts reacted immediately to Varonis' revelation. The price of Varonis' common stock declined dramatically. From a closing market price of $63.00 per share on October 28, 2025, Varonis' stock price fell to $32.34 per share on October 29, 2025, a decline of about 48.67% in the span of just a single day.

44.    A number of well-known analysts who had been following Varonis lowered their price targets in response to Varonis' disclosures. For example, Piper Sandler, while reiterating their neutral rating and slashing their price target more than 28.5% summarized that "In what was perceived as a fairly de-risked 2H setup, lower on-prem renewals (both Federal & commercial) drove a $1M miss to 3Q ARR, a $17M lower to full-year ARR expectations and a 5% RIF as the company realigns expectations and resource allocation in light of results."  The analyst went on to note that "given limited confidence from management on this being a one quarter issue, we expect the stock to remain range bound until further detail is understood, especially in light of the announced on-prem EoL."

45.     Similarly, Baird, while downgrading to a neutral position, highlighted the Varonis' "reset in visibility [and] execution," on the back of an "unexpected Q3 renewal shortfall in both federal/non-federal on-prem subs (~24%) prompted a notable ARR guidance cut and headcount reduction." The analyst further noted that Varonis' "hard end-of-life stance on self-hosted by 2026 further adds incremental execution complexity" and the "[r]isk/reward now skews more balanced." Pertinently, the analyst also highlighted the federal weakness specifically, noting renewals "were weaker than expected in the final weeks of Q3," and, as a result, "VRNS is downsizing its federal sales-team due to persistent underperformance in the vertical."

46.     Further, Barclays, while retaining its overweight rating alongside a 29% cut to its price target, highlighted "3Q NNARR of $25M was well below expectations" and "reported ~$25M in 3Q net new ARR [was] $5-10M below the upside expectation of $33M that we previewed, and also below VRNS' internal expectations for the quarter." The analyst noted their "surprise … since renewal rates for on-prem subscription improved in 1Q and 2Q and highlighted "possible sales execution issues as some reps may have been more focused on SaaS customers instead of on-prem conversions."

47.     The fact that these analysts, and others, discussed their surprise at Varonis' shortfall and below-expectation projections suggests the public placed significant weight on Varonis' prior revenue and sales estimates as they related to on-prem conversions. The frequent, in-depth discussion of Varonis' ARR guidance confirms that Defendants' statements during the Class Period were material.

### *Additional Scienter Allegations*

48.     During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements

disseminated on behalf of Varonis were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning Varonis' increased difficulty in continuing to secure renewals from on-premises users and their associated conversions to the SaaS system, including internal data reflecting weakening renewal rates, conversion resistance among legacy federal and non-federal customers, and internal sales execution dynamics that deprioritized such conversions.

49.     Despite such knowledge, Defendants repeatedly conveyed to investors that Varonis could maintain and/or improve its ARR growth trajectory in significant part by continuing to convert its existing on-premises customers to the SaaS system.  In fact, Varonis increased its full-year ARR growth rate projections for multiple quarters before quickly reverting in the third quarter of fiscal 2025 to below the initial guidance point set in the fourth quarter of fiscal 2024, supporting the inference that Defendants either knew the growth rate guidance lacked a reasonable basis when uplifted, or were deliberately reckless in failing to disclose known internal data undermining Varonis' projections.

50.     Defendants' scienter is further supported by their repeated praise of Varonis' conversion rates, whereby Defendants repeatedly emphasized that they are "pleased" and "feel good about the ability to convert our customers."  Indeed, Defendants continued to highlight how much more "effectively" they "were able to convert existing customers to SaaS" without ever disclosing to the public that the proverbial well was running dry as Defendants either knew the remaining cohorts of on-premises users would be resistant to conversion or were deliberately reckless in disregarding the dwindling portion of Varonis' clientele willing to convert to the SaaS offering. Defendants' repeated public discussion of Varonis' conversion rates demonstrates that

they monitored the conversion rates and therefore intentionally misled investors when discussing them.

51.    Furthermore, Defendants knew or otherwise acted with reckless disregard toward the fact that the federal on-premises client base was not going to renew their contracts in the third quarter.  Despite that Defendants were uniquely positioned to access such information, Defendants "assumed a similar contribution to last year" and promoted the claimed "huge opportunity in this [federal] vertical."  Defendants further contradictorily claimed that federal security would not be "negatively impacted from any energy efficiency initiatives," and that it would instead enjoy "a little bit of a tailwind on driving broad efficiency . . . and then security will continue to be a big driver of demand." Defendants' scienter is here further emphasized by the swift turnaround in the third quarter, from the claimed "tailwind" to now a "headwind related to the federal business that was really coming from renewals."

52.    Finally, Defendants blamed their own decision to set a firm date for end-of-life of the on-premises business as a contributing factor necessitating the reduced guidance.  However, Defendants not only had full control of the decision to both announce and set the end-of-life date, but they also had been planning to trigger the end-of-life announcement, even claiming it was their "plan all along," expedited by the third quarter under-performance.  As such, Defendants were well-aware of plan to set the end of the on-premises solution and what date that would be well ahead of their public disclosure and pertinently when they were setting and repeatedly uplifting annual guidance for fiscal 2026.  Ultimately, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in setting such ambitious ARR guidance targets despite their foreknowledge of the intent to terminate the on-premises solution to force the rest of its clientele to make the conversion.

### *Loss Causation and Economic Loss*

53.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Varonis' common stock and operated as a fraud or deceit on Class Period purchasers of Varonis' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Varonis' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Varonis' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

54.     Varonis' stock price fell in response to the corrective event on October 28, 2025, as alleged *supra*. On October 28, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Varonis' forecasting processes and growth guidance.

55.     In particular, on October 28, 2025, Varonis announced a significant miss to its annual recurring revenue on the back of significant misses to both its federal and non-federal on-prem conversion rates, reducing their own prior ARR guidance for fiscal year 2025 despite previously uplifting their guidance over multiple consecutive quarters.

### *Presumption of Reliance; Fraud-On-The-Market*

56.     At all relevant times, the market for Varonis' common stock was an efficient market for the following reasons, among others:

(a)     Varonis' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Varonis communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Varonis was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Varonis was reflected in and incorporated into the Company's stock price during the Class Period.

57.    As a result of the foregoing, the market for Varonis' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Varonis' stock price. Under these circumstances, all purchasers of Varonis' common stock during the Class Period suffered similar injury through their purchase of Varonis' common stock at artificially inflated prices, and a presumption of reliance applies.

58.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

59.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with ARR projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

60.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

61.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Varonis who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Varonis' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Varonis' common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Varonis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 24, 2025, there were 117.897 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

64.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Varonis;

(c)    whether the Individual Defendants caused Varonis to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Varonis' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

70.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Varonis' common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Varonis' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

71.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Varonis' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

72.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

73.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Varonis' internal affairs.

74.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Varonis' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

Varonis' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Varonis' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

75.     During the Class Period, Varonis' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Varonis' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Varonis' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Varonis' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

76.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

78.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Varonis' misstatements.

80.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Varonis which had become materially false or misleading.

81.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Varonis disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Varonis to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Varonis' common stock.

82.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Varonis to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

83.    By reason of the above conduct, the Individual Defendants and/or Varonis are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 7, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*