**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE VARONIS SECURITIES LITIGATION | Case No 1:26-cv-00117-PAE<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

## NATURE OF THE ACTION

1. This is a securities fraud class action brought by Lead Plaintiffs Clal Pension and Provident Ltd., Clal Insurance Company Ltd., and Atudot Pension Fund for Employees & Independent Workers Ltd ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned counsel. The action charges that the defendants named herein violated 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5) (the "Action").

2. The Action is brought on behalf of all investors who purchased or otherwise acquired the common stock of Varonis Systems, Inc. ("Varonis" or the "Company"), during the period February 4, 2025, through February 3, 2026, inclusive (the "Class Period").

3. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, SEC filings, wire and press releases published by and regarding Varonis, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

4. Varonis is a global security company that provides software products and services to discover and classify critical data, remediate exposures, and detect advanced threats.

5. In 2024, Varonis began transitioning customers from its "on-premises" solution to its more recently developed software-as-a-service ("SaaS") solution. The conversion of current on-premises customers to SaaS was critically important to the Company as it intended to discontinue support for its on-premises product. Defendants stated that the most important metric to evaluate the successfulness of the transition was the Company's annual recurring revenue ("ARR").

6. Throughout the Class Period, Defendants repeatedly told investors that the conversion of current on-premises customers to SaaS was going better than previously expected. For example, Defendants stated, "our existing customer convergence continue in a healthy way," "[c]onversions of self-hosted customers were also very strong," "we had a huge volume of conversions" and "[i]t's a no-brainer for [customers] to move." When asked "have you seen resistance from customers?" Defendants denied it, stating to the contrary, "it moved much faster than we thought."

7. Defendants also represented that each conversion from on-premises to SaaS included a 25%-30% price "uplift" because SaaS was more expensive, an increased expense that Defendants stated the customers were happy to pay for the superior SaaS product.

8. Again, when asked if there was any resistance from customers to converting and whether, as a result, "has there been any change to how you're pricing those SaaS conversions?" Defendants' response was unambiguous: "No, we don't see any change in terms of the pricing. We're seeing healthy uplift on the conversions themselves...[with] the price list of SaaS is 25% to 30% higher than the on-prem subscription. We're seeing very healthy conversions in terms of

pricing. We feel good about the ability to convert our customers…So we're very pleased with our ability to convert. The pricing is holding very well." When pressed by another analyst about the "uplift when you convert someone" and whether there are any "headwinds" Defendants again said "the uplift, it's 25%, 30% when we do the conversions" and "yes, we are getting that uplift and we are – we're seeing very strong pricing from the uplift."

9. Following Q1 2025, Defendants claimed that they were accelerating the transition because of the success converting customers: "The reason we are accelerating this transition is because…we were able to convert existing customers to SaaS more effectively." Despite questions and concerns from analysts, Defendants' message was unchanged: "[W]e are also seeing strong demand from existing customers looking to convert to our SaaS platform" and "when you look at kind of the conversions that we had in Q1 they were really strong."

10. Following Q2 2025, Defendants similarly stated, "We again saw strong demand from existing customers looking to convert to our SaaS platform" and "We also saw the conversions and existing customers contributing nicely." Defendants did not equivocate at all. To the contrary, they stated that conversions were ahead of expectations: "going very well…I wouldn't say that we're shocked by how good it's going. We're very happy, and we knew that we could do better than 2024."

11. Defendants also assured investors that the Company had sufficient security certification for its federal customers, which required higher security levels than non-federal customers, highlighting that "we achieved the FedRAMP Authorization, enabling us to offer our entire SaaS platforms to the federal sector" and "that's really a big deal from our end."

12. Based on the purported success of the conversions, Defendants provided fully year 2025 guidance for ARR of $737 million to $745 million at the start of 2025, increased the guidance

following Q1 2025 to a range of $742 million to $750 million, and increased it again following Q2 2025 to a range of $748 million to $754 million.

13. In truth, as recounted by numerous former employees, the resistance to converting was immediate and widespread. This was so evident even before the Class Period that by late 2024, there began "rumblings" about conducting a "free migration push" – that is, converting customers to SaaS without any increase in cost – a 0% "uplift." By April 2025 the no-cost conversion was occurring Company-wide.

14. In addition to the "carrot" of no-cost conversion, the Company implemented the stick – telling on-remises customers that converting to SaaS was their only option, they could not renew their on-premises and the Company would not support the customer when the current contract expired.

15. Even with the no-cost conversion, customers were resisting and refusing to convert. The Company was aiming for an 80% to 100% conversion rate, but the percentage that actually converted was between 30% and 60%.

16. Concerned about the resistance to converting, the Company told its sales force to convert on-premises customers to SaaS as soon as they could, even if the customer's current contract expired in a future quarter. By converting customer contracts to SaaS prior to the quarter in which they were up for renewal, Varonis was inflating the current conversion figures and masking the fact that many customers had refused to convert to SaaS and the remaining customers were heavily weighted toward resistant and refusing customers

17. Converting the federal customers was a lost cause. A significant problem created by Varonis refusing to renew customers to an on-premises contract is that the most of the Company's federal customers, including all $30 million worth of contracts with the Department

of Defense, required a higher level of security certification than the FedRAMP certification that the Company obtained. These customers would never convert to SaaS and would have to go to a competitor.

18. Investors began to learn the truth on October 28, 2025. Varonis announced its financial results for Q3 2025, disclosing a significant miss to ARR and reducing its guidance for the full fiscal year 2025 to the range of $730.0 million to $738.0 million. The Company attributed its results and lowered guidance on weaker than expected renewals and conversions in their federal and non-federal on-premises business. Varonis also announced the end-of-life of the self-hosted solution and a 5% headcount reduction.

19. Investors and analysts reacted immediately to Varonis' revelation. The price of Varonis' common stock declined dramatically. From a closing market price of $63.00 per share on October 28, 2025, Varonis' stock price fell to $32.34 per share on October 29, 2025, a decline of about 48.67% in the span of just a single day.

20. Then on February 3, 2026, Varonis announced its 4Q 2025 and full-year 2025 financial results as well as Q1 2026 and full-year 2026 guidance. The issued 2026 guidance was lower than the market anticipated and included a "$30 million to $50 million headwind to free cash flow and ARR" for customers that would not convert to SaaS. Defendants disclosed that "[t]he largest cohort of customers that we don't expect to convert to SaaS are federal and state government customers."

21. Investors and analysts reacted immediately to Varonis' revelation. The price of Varonis' common stock declined dramatically. From a closing market price of $26.53 per share on February 3, 2026, Varonis' stock price fell to an opening price of $23.17 on February 4, 2026,

and closed at $23.67 on February 4, 2026, a decline of about 10.78% in the span of just a single day.

## JURISDICTION AND VENUE

22. Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

23. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

25. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Varonis was headquartered in this District during the Class Period and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

26. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

27. Plaintiffs purchased Varonis' common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the Defendants' fraud. Plaintiffs' certifications evidencing their transactions in Varonis were previously filed. *See* ECF No. 15-3.

28. Varonis Systems, Inc. was a New York corporation during the instant Class Period with its principal executive offices located at 1250 Broadway, 28th Floor, New York, NY 10001.

On or around the first quarter of fiscal 2025, Varonis relocated its headquarters to 801 Brickell Avenue, Miami, FL 33131, yet the company has continued to maintain the previous New York headquarters location. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "VRNS."

29. Defendant Yakov Faitelson ("Faitelson") was, at all relevant times, the Co-Founder, Chairman, CEO, and President of Varonis.

30. Defendant Guy Melamed ("Melamed") was, at all relevant times, the Chief Financial Officer and Chief Operating Officer of Varonis.

31. Defendants Faitelson and Melamed are sometimes referred to herein as the "Individual Defendants." Varonis together with the Individual Defendants are referred to herein as the "Defendants."

32. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Varonis' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

33. Varonis is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

34. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Varonis under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### I. COMPANY BACKGROUND

35. Varonis is a global security company that provides software products and services to discovery and classify critical data, remediate exposures, and detect advanced threats with the help of AI-powered technologies.

36. During the Class Period, Varonis offered both on-premises ("on-prem") and software-as-a-service ("SaaS") solutions.

37. On-premises requires hosting the software and databases on the customer's own servers and managing maintenance, patching, and scaling.

38. SaaS is a Varonis-operated, cloud-native platform that eliminates infrastructure burdens, offering rapid scalability and automated updates

39. Varonis announced the availability of its flagship Varonis Data Security Platform as a SaaS at the end of 2022.

40. During the Class Period, Defendants told investors that the three "North Stars" most important for judging the success of the transition were (i) Annual recurring revenues ("ARR"); (ii) free cash flow; and (iii) SaaS mix.

41. ARR is a key performance indicator defined as the annualized value of active SaaS contracts, term-based subscription license contracts and maintenance contracts in effect at the end of that period. SaaS contracts, term-based subscription license contracts and maintenance contracts

are annualized by dividing the total contract value by the number of days in the term and multiplying the result by 365.

## II. VARONIS BEGINS TRANSITION TO SAAS – STATING CONVERSIONS ARE OCCURRING EASILY AND WITH A 25%-30% PRICE "UPLIFT"

42. Varonis described the transition as occurring in two phases. Phase 1 began when the Company introduced the SaaS product and focused on selling SaaS to the Company's new customers. Phase 2 of the transition was the converting the Company's installed base of on-prem subscription customers to the SaaS platform.

43. During the Q4 2023 earnings call on February 5, 2024, Melamed stated that Phase 2 conversion of on-prem clients was "planned to begin in earnest during the second half of this year. We expect that the ramp-up of this phase will not be linear, and anticipate growing momentum in each quarter of 2024, and further accelerating in 2025 and 2026."

44. Melamed told investors that the Company would be completely transparent with the status of the conversion to SaaS, stating, "When we launched this transition, we committed to being transparent and also to providing metrics that accurately measure the health of the business."

45. Highlighting the purported success of converting existing customers to SaaS, Melamed stated, "In the fourth quarter, we had approximately $15 million in conversions of existing customers, impacting our Q4 revenue. To be clear, this $15 million represents the renewal amount that was previously booked as on-prem subscription, but which converted to SaaS during the quarter." And emphasizing the "uplift" in pricing associated with the more expensive SaaS offering, Melamed stated, "The $15 million revenue impact from this quarter does not include the uplift that we realized from these conversions, which is accretive to ARR and free cash flow."

46. Melamed told investors that they were having no trouble converting customers to the cloud-based and more expensive SaaS, claiming that customers did not need to be sold on the

product and were eager to switch. Melamed stated, "It's happened kind of the whole conversion in 2023, happened in a natural way and it's been very extremely encouraging for us." The conversions were occurring so easily that the Company did not even need to incentivize their sales force to push the conversions because the additional pricing "uplift" from the conversion went toward the salesperson's quota:

> I think the overall understanding and the feedback that we're getting from our customers is that ***they prefer the SaaS offering***, because it's a better product. ***And in terms of, from a commission perspective, our reps retire quota on anything on top of that renewal. So on the uplift that they get from an existing customer in that conversion that goes towards their quota retirement.***
>
> So it's actually a win-win. It's a win-win for ***-- it's a win for our customers and it's a win for our sales team.*** And that's the best way to kind of incentivize. And that's why the 2023 has been a great surprise in the level of conversions that we saw. And our expectation is for an acceleration in 2024, which would bring us to that $285 million of SaaS by the end of this year.

47. During the call, almost every question from analysts concerned the status of converting current clients to SaaS.

48. Jason Ader of William Blair asked "How much incentives do you provide for them [to switch]? I know you have 25% to 30% price uplift. That doesn't seem like much of an incentive to me if I'm a customer."

49. Melamed responded that clients were happy to pay the 25% to 30% price increase because the product was just that popular: "I'd start by saying that that 25% to 30% uplift is actually a significant incentive for our customers to convert, because the total cost of ownership saves them money. So, yes, they pay more on our price list. But at the end of the day, they save on the hardware and they save on the people and they're getting a much, much better product."

50. Melamed also emphasized, "Obviously, as you look at kind of the seasonality, we have historically way more renewals happening in the second part of the year. That's why we

talked about the Phase 2, and the conversions happening, accelerating towards the second part of the year for obvious reasons."

51. In response to another question regarding the conversions and incentives for the sales force, Melamed repeated that the conversions were occurring easily, "in a natural way" and with "momentum," stating:

> We had discussions internally of whether it makes sense to incentivize the conversions in 2024. And I can tell you that with the momentum and the fact that it's happening in a natural way, we didn't see any reason to, at this current stage, to put additional dollars to work from a commission perspective, because what the reps are actually benefiting from is the uplift on the conversion.
>
> So anything on top of that renewal amount goes towards their quota retirement, and we've definitely seen some healthy uplift. There's a 25%-30% uplift, but if that conversion requires additional users, additional licenses, additional platforms, then those increases are actually higher than that 25%, 30%, and that's very beneficial for our reps.

52. During the Q1 2024 earnings call on May 6, 2024, Melamed repeated that "we're excited to begin Phase 2 in earnest in the second half of 2024, which will be focused on converting our installed base of on-prem subscription customers to our SaaS platform. As a reminder, we expect that the ramp up of this phase will not be linear and momentum should grow in each quarter and further accelerate in 2025 and 2026."

53. Analysts were again focused on the status of converting on-prem clients to SaaS.

54. Brian Essex with JPMorgan Chase & Co asked "How do you think about incentivizing the sales force with regard to…more proactive conversion of your installed bases…?"

55. Melamed repeated: "What we have seen from a conversion perspective is that it's happening in a natural way. When you look at the uplift, obviously it's beneficial for the customers because they're getting a much better product, but it's also beneficial for our sales force because

anything on top of that renewal goes towards their quota. So, at the beginning of this year, we didn't change the incentive for the conversion because it is happening kind of in that natural element, which is great for us and is working great for our customers."

56. Rudy Kessinger with D.A. Davidson asked for the Company to share the dollar value of conversions as they did for Q4 2023: "can you share how much of your existing ARR converted to SaaS this quarter, or just directionally, did you convert more or less in Q1 than you did in Q4?"

57. Melamed did not provide the specifics requested, instead reassuring investors, that the conversions were going well but that the success and dollar amount of conversions is not really important: "When we look at the results in Q1, we were really happy with the conversions in Q1. They really helped us get the SaaS, where you look at kind of SaaS coming 30% of total ARR, or where you look at the number, it's actually $165.5 million. When we look at the metric itself, we didn't talk about the actual dollar value of the conversions, because the metric you should focus on is SaaS ARR is that really measures the progress in completing the transition, which is one of our overarching goals. But SaaS ARR was very strong in Q1, and the existing customer conversions obviously played into that."

58. During the Q2 2024 earnings call on July 29, 2024, Faitelson stated, "We continue to see healthy demand from existing customers converting from our self-hosted platforms to Varonis SaaS."

59. Melamed likewise stated, "At the end of Q2, SaaS ARR increased to approximately $210 million or 36% of our total company ARR, ***driven by strong contribution from*** new logos and ***existing customer conversions***."

60. Melamed also highlighted the pricing "uplift" from conversions was actually higher than the 25%-30%: "Pricing continues to be in-line with our price uplift increase of 25% to 30%, and in some cases we see deal sizes increase in excess of that as customers consume more of the platform upon conversion to our SaaS platform. We expect that the ramp-up of this phase will not be linear and momentum should grow in each quarter with further acceleration in dollar terms in 2025 and 2026."

61. Melamed reminded investors that Q4 would see more conversions given the seasonality of the contracts: "As it relates to our quarterly revenue guidance, there are more conversions embedded in our Q4 guidance versus our Q3 guidance because we have more renewals in Q4 from a seasonal perspective."

62. Melamed also told investors that Q3 each year was the critical quarter for the federal clients and they were still selling on-prem subscriptions to those clients: "And the third quarter is Federal's largest quarter and we still expect to sell on-prem subscription in that vertical."

63. Saket Kali with Barclays asked, "Yaki, can you maybe just talk about the success that you're having in converting your on-prem customers to SaaS? And Guy, maybe as part of that discussion, I mean, you talked about, I think sort of an in-line uplift that as you talked about in the past, but it sounds like maybe it's doing a little bit better."

64. Faitelson responded, "SaaS conversions are working very well because of the offering, talking about completely automated outcomes. If you have us, most probably you will not have a data breach and a data loss… The customers will benefit tremendously while moving to SaaS. So this is a fairly easy proposition for them to move to our SaaS platform."

65. Melamed stated, "And from a pricing perspective, there is a 25%, 30% price lift -- uplift on a like-for-like basis….And what's very interesting to see is that when we kind of built

the packaging for SaaS, our desire really was to have customers consuming more of the platform. And what we're seeing is that they're actually doing that. We're seeing deal sizes increase, in excess of that uplift. So that's working really well for us."

66. Melamed also stated, "When you look at the conversions in Q2, that really helped us get to approximately 36% of total ARR coming from SaaS or really $210 million. And what we actually saw is an increase in the conversions. A lot of them came from perpetual maintenance customers, which was really a positive sign for us."

67. Andrew Nowinski with Well Fargo asked "So you talked about now expecting more conversions in Q4, …I'm wondering what prompted this change in assumptions this quarter and what you saw in the results in Q2 that may have prompted that?"

68. Melamed responded, "I don't think there's any change in the way we're looking kind of at the -- at Q2 and definitely not putting anything in different light in Q4. …Q4 is the largest quarter. So we're taking advantage of any renewal as an attempt and desire to convert them into SaaS."

69. Melamed again emphasized how eager all customers were to convert to SaaS:

> [W]e saw perpetual maintenance customers choose to convert to our SaaS platform. ….[W]e didn't initially plan for those customers to convert to our SaaS offering. So the fact that we're seeing this happen in a natural way is a huge positive to the business.
>
> [W]e saw an increase in customers choosing to convert ahead of the actual renewal date, ... So really to summarize, when you look at kind of the momentum of the business, it's really strong.

70. Shrenik Kothari with Robert W. Baird was curious about the large number of on-prem clients that had not yet converted and hypothesized that those customers may be more averse to conversion, and asked Defendants how they would deal with those customers:

> Just, that's all great, but just curious, you still have a long tail of the on-prem base, which might be a bit more price sensitive and bit more averse to transition that we

> kind of have been hearing. … Just can you elaborate a bit on how do you plan on working with these customers to demonstrate the value proposition, justify this price uplift of the SaaS platform for this existing cohort of on-Prem?

71. Faitelson flat out rejected the idea that any group of customers would hesitate to convert to SaaS and that while the conversions took effort no customers were hesitating: "Yeah, I think that with the vast majority of our customers, it's just very compelling to move to SaaS because of the automated outcomes…But these transitions are hard work. You need great attention to details, a lot of execution…But, you know, we know how to do it. We know how to do transitions, but can tell you that, every day it's just a lot of work and you need to do it diligently and effectively. But this is exactly what we are doing and you can see the results."

72. During the Q3 2024 earnings call on October 29, 2024, Faitelson stated "We also saw continued strong demand with existing customers looking to convert the Varonis SaaS with MDDR protection."

73. Melamed stated "our SaaS transition continues to gain momentum with SaaS now representing 43% of our total company ARR. We saw a strong contribution from both new logos and existing customer conversions, including conversions from perpetual maintenance customers… As we look ahead to the fourth quarter, we anticipate converting more customers to our SaaS platform. Pricing continues to be in-line with our price list increase of 25% to 30% and in some cases, we see deal sizes increase in excess of that as customers consume more of the platform upon conversion to SaaS. We expect that the ramp-up of this phase will not be linear and momentum should grow each quarter with SaaS conversion showing further acceleration in dollar terms in 2025 and 2026."

74. Melamed also stated, "Q3 total revenues were $148.1 million, up 21% year-over-year, reflecting our strong performance as well as a higher contribution from perpetual maintenance converting to SaaS."

75. The focus of analysts and Defendants during the call was against again the status of the conversion of existing customers to SaaS.

76. Saket Kalia with Barclays asked "Guy, I've gotten the question from investors just around how much of the net-new ARR generally through this process has come from conversion."

77. Without providing the underlying figures, Melamed reassured investors, "without the conversions, we wouldn't have gotten to 43% of total ARR being SaaS or approximately $260 million… But at the end of the day, what drove the momentum -- the momentum this quarter and also last quarter when you look at kind of the commentary that we gave last time is the new logos, the MDDR offering and that's really what's driving the business."

78. Brian Essex with JPMorgan Chase & Co: "And how smoothly is it going for those existing customers that you're converting over now?"

79. Faitelson responded, "In terms of the overall value proposition and our ability to get to outcomes, the SaaS is second to none…So anytime our customers are tasting the value, this automated outcomes that we, that we provide, it's just -- it's a game changer…. So once customers taste it and understand just the regular value of a high quality SaaS architecture, but primarily these automated outcomes that they can get most of the value is literally doing nothing automatically generates a lot of appetite to do the conversion."

80. Melamed added, "One thing to add, and I think it's a very good question in terms of kind of the value proposition and kind of the commentary that we gave about the fact that many of our customers are asking for SaaS and wanting to switch to SaaS because it's a much better product."

81. Fatima Boolani with Citi followed up on the question that Defendants attempted to sidestep: "Guy, I wanted to double back on an earlier question with respect to some of the

conversion momentum that you're seeing in the base. Understand that it's not like flipping a switch, but I'm curious to understand how much of your installed base has actually converted?"

82. Melamed again tried to shift the focus away from specifics about how successful the Company had been about converting customers to SaaS, instead telling investors to just look at the percentage of ARR that was from SaaS (but which included customers that had never been on-prem): "So again, when we look at kind of where we are from SaaS out of total ARR, getting to 43% was definitely -- you can't get to that percentage without having existing customers converting. Our Q3 conversion was very similar in dollar terms to the Q2 conversion amount. So again, as the same commentary that we gave in Q2, the strength of the quarter came from new business, the MDDR, and the fact that we're seeing shorter sales cycles on the SaaS offering.

83. Rudy Kessinger with D.A. Davidson, also tried to follow up on the evasion to get a more specific answer to how the conversion was going: "Someone has talked I get a lot of questions from investors just on the conversions and contribution towards growth. Guy, you said in response to a question earlier, you converted about the same amount in Q3 as you did in Q2. If I look at the numbers here, the step down in your term and perpetual ARR was about $5 million higher Q2 to Q3 than Q1 to Q2. So it looks like from those numbers, you converted a good chunk more. So I'm curious how gross retention has been trending and how it was in Q3 versus Q2 in prior quarters just as you've started to lean into the conversion motion more to your existing customers."

84. Melamed responded, "I can tell you that when you look at kind of the conversions, we have seen more conversions happen from our customers that own maintenance of perpetual and that's part of the reason you're seeing that revenue increase because in a way, there's no headwind when you convert the maintenance of perpetual to SaaS. When you look at the

maintenance and services line items and when you look at the decline there, the majority of that decline in that line item is actually coming from conversions. So when you look at our conversions, I think we're happy with customers converting."

## III. VARONIS BEGINS PUSH TO CONVERT EVERY ON-PREM CUSTOMER TO SAAS IMMEDIATELY REGARDLESS OF RENEWAL QUARTER AND YEAR BUT MANY CUSTOMERS REFUSE TO CONVERT

85. Former employees (FE's) described how Varonis struggled from the start to convert On-prem customers to SaaS.[1]

### A. Former Employees – Roles and Responsibilities

86. FE1 worked at Varonis from May 2021 to October 2025 as a Technical Account Manager, reporting to Tim Brown, Manager of Customer Success. In this role, he worked as a team with an Executive Account Manager and a Sales Engineer. The Executive Account Manager negotiated new sales and renewals with the customers. The Sales Engineer was brought in to demonstrate the software for customers new to Varonis or new to the cloud prior to a sales contract. He was part of the company's strategic effort to convert all legacy subscription (perpetual license and on premises subscriptions) customers convert to the company's SaaS cloud service contracts. Throughout his time at Varonis, FE1 worked in the "midmarket" commercial sector of sales. Midmarket customers had between 750 and 1,200 employees, with annual contract of about $60,000 to $110,000. Companies larger than 1,200 employees were in the "enterprise" sector. Companies up to 750 employees were small business.

87. FE2 worked at Varonis from January 2022 to May 2025 as a Technical Account Manager, reporting to Mike Cady, Manager of Strategic Customer Success, who reported to Paul

[1] To protect their anonymity, FE's are all described using male pronouns regardless of the individual's gender.

Browning, Senior Director of Customer Success. FE2 supported customer account managers who were responsible for upselling and renewing contracts.

88. FE3 worked at Varonis from August 2021 to October 2025 as a Mid-Market Account Manager during the Class Period. He reported to Robbie Ellis, Mid-Market Sales Manager. Ellis reported to Eric Zhao, Senior Sales Manager – Mid-Market. FE3 worked as a salesman for Varonis managing both contract renewals for existing customers as well as acquiring new customers.

89. FE4 worked at Varonis from September 2020 to January 2025 as an Account Manager, reporting to Mark Hoffman, Regional Sales Director. He was responsible for obtaining renewal subscription contracts with existing customers as well as landing new customers.

90. FE5 worked at Varonis from June 2022 to June 2025 as a Commercial Account Manager during the Class Period. As a Commercial Account Manager, FE5's job was to acquire new customers to Varonis' SaaS cloud services as well as convert existing on premises customers to SaaS. His market was small and medium size companies located in Indiana and Michigan.

91. FE6 was a Sales Engineer at Varonis from March 2022 to May 2025. His territory was mostly eastern Pennsylvania and Delaware as well as parts of New Jersey and New York. He reported to Joe Geis, Sales Engineering Director – Northeast. FE6's job as a sales engineer involved supporting the sales representatives in his territory as they worked to secure new customers, renew current customers' contracts, and upsell current customers on new products.

92. FE7 was Regional Sales Manager of the Southwest region in the enterprise division at Varonis from January 2025 to October 2025. FE7 initially reported to Abby Prescott, Regional VP of the Southeast. After Prescott left Varonis in May 2025, FE7 reported to Bryan Popa, Regional VP of Sales. Popa reported to Sam Wethje, VP of Sales North America. Wethje reported

to Greg Pomeroy, SVP of Worldwide Sales. FE7 oversaw sales reps in the Southeast region of the U.S. who focused on companies with more than 1200 employees, which were categorized as "enterprise" customers. The sales reps acquired new customers as SaaS subscribers and worked on converting on premises customers to SaaS subscribers. He stated that in 2025, Varonis was no longer selling on premises systems.

93. FE8 was a Corporate Sales Engineer from February 2025 to August 2025 and a Federal Sales Engineer from August 2025 to October 2025. He was based in Washington, D.C. As a Corporate Sales Engineer. FE8 reported to Corporate Sales Engineering Team Lead Jeffrey Proko. Proko reported to Director of Inside Sales Engineering Wilson Liang, who reported indirectly to Regional VP of Sales Engineering Justin Wilkins. As a Federal Sales Engineer FE8 reported to Managing Member Varonis US Public Sector Georgi Georgiev, who reported to Federal Engineering Director Trevor Brenn, who reported to Regional VP of Sales Engineering Justin Wilkins.

94. FE9 worked at Varonis from April 2023 to October 2025 as a Federal Account Executive, reporting to Chad Mason, VP of U.S. Federal Sales. Mason reported to Greg Pomeroy, SVP of Worldwide Sales. FE9 was a customer-facing sales representative who oversaw a large portion of Varonis' contracts with the U.S. Department of Defense.

95. FE10 was a Federal Account Executive from January 2016 to July 2025. FE10 was based in Austin, Texas during the Class Period. He reported to then-Co-President of the US Public Sector Chad Mason. Mason reported to then-President of the US Public Sector Mike Wallace. After Wallace left, he reported to VP of the Public Sector Craig Mueller. Mueller reported to then-SVP of Sales Jim O'Boyle then, after he was promoted to SVP of Worldwide Sales Greg Pomeroy.

96. FE11 was the Regional Sales Director – Federal Civilian and Systems Integrators at Varonis from November 2019 to October 2024. He reported to Mike Wallace, President of US Public Sector. FE11 was part of the public sector sales team, which handled contracts with federal agencies both civilian and defense.

### B. Customers Resist Converting to SaaS Well Before 2025

97. As Melamed later acknowledged: "our sales force has been trying to convert customers in discussions with our customers for -- since we announced the transition."

98. FE6 likewise stated that not long after Varonis launched its SaaS cloud platform , the Company told its salespeople to transition all on-premises subscription customers to the cloud services. In response to Varonis' push to transition on-premises subscribers to the cloud, a number of customers pushed back, FE6 said. Some customers liked having their data on site and on their own server and computer equipment. Some customers did not like the more expensive price tag that Varonis was charging for SaaS versus on-premises subscriptions, he said. Converting from Varonis' on-premises platform to SaaS cloud was a big ticket item for many customers, costing "tens of thousands" of dollars if not more depending on the account size, he said.

### C. Varonis Primary Focus for 2025 – Convert 100% of On-Prem Customers to SaaS Even Before Their Contracts Are Up For Renewal

99. At the start of 2025, the mandate to the sales force was clear – convert every single On-prem customer to SaaS by the end of the year. As Faitelson later acknowledged, "***So we wanted to move everybody to SaaS**…**all along, the whole thought process was to move to 100% SaaS business.***"

100. FE1 recalled that he was told by his manager in November 2024 that the main goal for 2025 was to convert all on-prem customers to SaaS. The initiative was officially announced at Varonis' sales kick-off event in January 2025, in which the Company directed its sales team to

focus on converting every legacy customer (on-premises subscriptions and perpetual license holders) to SaaS. "For 2025, our main goal was to convert legacy customers to SaaS – to the cloud solution."

101. FE2 likewise stated that at the beginning of 2025, the Company told employees the strategy for the year was to switch every customer to SaaS contracts and stop selling on-prem. "In 2025, they no longer wanted to keep selling on-premise," he said. "The goal was to move every customer to SaaS, and they wanted that done before the end of the year." At the time, there were a significant number of customers who had on-premises subscriptions with Varonis, he said. FE2 recalled he was responsible for about 30 customers who had on-premises contracts. FE2 said Varonis also wanted to switch all term license customers to SaaS contracts. Term license customers were also on-prem. These customers purchased Varonis software for a specific term and were not paying a software subscription fee. Rather, they paid Varonis to support the software via maintenance and services fees. The Company wanted him to focus on convincing all on-premises and term license customers of the benefits of switching to SaaS cloud services.

102. FE3 also stated that in early 2025, the Company went fully in on the SaaS launch and pushed its sales team to convert all of its on-premises customers to SaaS. "That was a huge focus," he said, noting the company started offering high bonuses to salespeople to convert. "You can get paid three, four times (higher), depending on your customer base, getting everyone over to SaaS." FE4 similarly recalled that the Company incentivized salespeople to transition all their customers from on-premises subscriptions to SaaS cloud service. FE5 confirmed that in early 2025, converting existing on-prem customers to SaaS became a much bigger focus. A significant part of his performance review was based on his conversion rate of on prem to SaaS.

103. As Melamed later confirmed, the Company began discussing conversion with on-prem customers well-before their contracts were up for renewal: "we're dealing with the conversions ahead of time. We're talking now to customers that are up for renewal in Q4. We're not waiting for Q2 or Q3 to have those types of conversations." However, more than just conversations occurred early. The sales force were instructed to pull forward and convert on-prem contracts to SaaS even if those on-prem contracts were not up for renewal until future quarters. FE6 said the conversions were usually done before the customers' contract renewal was due.

**D. Varonis Tries To Strong-Arm Customers Into Converting To SaaS**

104. FE5 stated that Varonis had begun telling its customers starting in 2024 that the on prem systems were nearing "end of life" as the Company made the switch to SaaS.

105. FE1 recalled that at the beginning of the year, Varonis came out strong, telling its legacy customers that the Company was going to stop supporting its on-premises software so the customer was required to convert to the cloud. "It was a pretty heavy, hard push to try and get people (to convert)," he said. "Me personally, I don't like to get forced into something. Early on, the strategy was they were forcing you to convert. (Customers) didn't respond well to that."

106. Varonis did not want the public to know about the tactic. FE3 said salespeople were told not to put it in writing, but they were instructed by the company to tell customers they needed to make the switch because Varonis would no longer support on-premises systems after existing contracts expired.

107. FE6 also confirmed that in early 2025 Varonis began telling customers the Company would stop supporting on-premises software when the existing customers' contracts expired. He began to hear talk internally in early 2025 that the company was going to "deprecate" the on-premises platform. FE6 said "deprecate" meant the platform was reaching "end of life" and would no longer be supported by Varonis. FE6 said in the months before he left in May 2025, he

began to give his customers an informal head's up that the Company would likely stop supporting the on-premises platform.

### E. The Conversion Push Was Such A Failure That Varonis Eliminated the Price "Uplift" Before The Start of 2025 And Began To "Pull-In" Conversions Of Contracts Not Up For Renewal Until Future Quarters

108. FE6 recalled that even prior to the official January 2025 formal announcement, customers were pushing back on making the conversion to SaaS. As a result, Varonis began to tell salespeople to offer the conversion at no additional costs to resistant customers. "Within a year of me selling (the cloud)…I was told by my manager to do flat conversions where needed." FE6 recalled that it was as early as late in 2024 when he began to hear "rumblings" internally at Varonis of a "free migration push." Meaning, the Company was offering reluctant on-premises customers a no cost conversion to SaaS. Polinski also heard talk from other sales reps and sales engineers about customers who were given free conversions to SaaS with no uplift fees. He said these were usually done before the customers' contract renewal was due. He did not know directly who approved the free conversions, but he said, "It had to be Greg Pomeroy and Yaki (Faitelson)."

109. FE3 likewise stated, right away, he and many of the other salespeople came up against customer pushback and resistance to converting from on-prem to SaaS. The biggest hurdle was the price increase, he said. He recalled the increase was as much as 40 percent, which was steep for mid-market customers who had between 501 and 1250 employees. Customers who were happy with their on-prem systems were frustrated by the requirement that they switch to SaaS, something they did not want and for which they had to pay significantly more money. "The cost drastically increased," FE3 said. "On top of that, it felt like we were strong-arming our customers to move over and pay more money. We just had to deal with that, and that made things very difficult… There were a lot that were very unhappy," FE3 said.

110. As a salesperson, FE3 was instructed by Varonis to remind customers they would no longer need to pay for their own servers, so while the subscription price might be higher, the customer's infrastructure costs would be lower. For many on-prem customers, however, the savings on infrastructure was not going to cover the increased subscription costs -- at least at the mid-market size, FE3 said.

111. FE3 said salespeople were also expected to point out all the new features and capabilities that the SaaS service provided, including the ability to add new features with regular and easily implemented software updates. But all the bells and whistles that Varonis offered with SaaS were often not features on-prem customers wanted or needed, so it was not enough to entice them to sign up for something that cost significantly more, he said.

112. FE3 said another problem with selling SaaS to on-prem customers was the new pricing model; prior to the SaaS cloud service, Varonis's on-premises pricing model allowed customers to buy the baseline software and add on other features as they needed. The baseline offered Varonis signature feature: "visibility into your own environment" of data, FE3 said. Add-ons included "classification," "edge protection," and "monitoring movement of data," he said. The new SaaS pricing model was significantly more expensive, and the subscriptions were sold as bundling packages with incentive discounts, but those packages did not work for a lot of mid-market customers, FE3 said. Often these customers did not want all or most of the features in the bundles, he said. For the smaller companies, they might only need one of the features in a bundle. FE3 explained that while the bundling package provided savings for customers who wanted a number of the features included, customers who only wanted one or two did not find the bundling price worthwhile because they would be paying for a number of features they did not need. Yet

the cost of buying just the one or two add-on features was very steep without the bundling incentive, he said.

113. The pricing model frustrated customers who had been able to add on features as needed to their on-prem software systems at affordable prices: "SaaS was incentivized as a bundling solution, but a lot of existing customers would say, 'We don't need half the products in this suite,'" FE3 said. "They are paying double for SaaS including products they don't need. It was forcing it on them," he said.

114. FE3 said the notes in Salesforce.com, the Company's internal database for its sales pipeline, sometimes reflected that a customer had already flatly stated a switch to SaaS was not possible, yet the mid-market team was expected to convert them.

115. FE2 likewise said the cost to switch to a SaaS contract was significantly higher than what on-premises customers had been paying. A number of his customers did not want to switch, many of them citing the increased costs. "They didn't want to pay the extra 20 to 30 percent," he said. For a mid-six figure or multimillion dollar contract, 20 to 30 percent increase was significant.

116. FE2 noted that Varonis had expected the transitions to go smoother than they did. "Not as many people would move to SaaS as they thought they would," he said.

117. FE5 said some customers were happy to hear Varonis was offering SaaS cloud services because of the additional features offered, but that was a smaller percentage than the customers who were not enthused. FE5 estimated about 15-to-20 percent of existing on-prem customers were excited about switching to SaaS cloud service, but about 30-to-40 percent were apprehensive, and about half of those were "very, very against it" or "couldn't do it." "There were some customers that were very, very receptive," he said. "And there were customers that were

equally as strong against doing that – to the point they would be frustrated with the amount of times we would bring up SaaS" FE5 said.

118. One of the problems FE5 faced selling SaaS to existing on-prem customers was the lack of value added for the higher cost of SaaS, especially for small and medium size businesses, he said. He said a number of these smaller sized companies had purchased Varonis software for one particular solution: "In my experience, the customers who were apprehensive were customers that were using the software for a very particular thing – mostly data classification," he said. These customers did not want the additional software solutions that were included with SaaS, especially because they were being asked to pay more for the software they had been using, he said. FE5 would regularly hear from customers something like, "We only use you guys to do X, Y, or Z, we don't need you guys to do all these other things."

119. FE5 also noted that the small and medium size companies had smaller IT budgets, usually about $100,000 to $200,000 total per year. Switching to Varonis' Saas service would eat up most of the annual IT budget for some of these companies. "If they switched to our SaaS platform, it would have taken up a majority of that budget," he said. "That was another reason they were apprehensive."

120. FE7 recalled failed attempts to convert major on-premises customers to SaaS in his region during his tenure: Yum! Brands[2], an on-premises customer, decided not to convert to SaaS in Q2 2025 and took their business to a competing company. "They chose not to renew (their

[2] Yum! Brands (NYSE: YUM) is a global fast-food corporation based in Louisville, Kentucky. It operates over 63,000 restaurants in more than 155 countries. Their portfolio includes KFC, Taco Bell, Pizza Hut and The Habit Burger & Grill. For the full year 2025, Yum! Brands reported total annual revenues of $8.214 billion. Yum! Brands directly employs approximately 49,000 corporate and field staff. However, when including franchise locations across KFC, Taco Bell, Pizza Hut, and Habit Burger & Grill, the global system supports over 1,000,000 employees and franchise team members worldwide.

contract) after we pressed them from January to May," FE7 said. "They went to a competing product." Tractor Supply Company[3], an on prem customer that was up for renewal in Q3 2025, "still had not converted when I left [in October 2025]," he said. And on-premises customer Pilot Flying J[4] "had not accepted a meeting" with Varonis to learn more about SaaS by the time FE7 left the company in October 2025.

121. By April 2025, FE7 knew something was not right at the Company as management exerted intense pressure for even losing a small deal. When a new SaaS customer deal that was scheduled to close in April 2025 in FE7's region was delayed, FE7's boss at the time called to criticize her. Abby Prescott, the Regional VP of the Southeast, "reamed me a new one" over the delayed deal, FE7 said. In FE7's 20-plus years in sales, no manager had ever talked to him like that, he said. FE7 was surprised that Prescott was so upset over what was a relatively small value deal for $100,000.

122. FE1 said many on-prem customers were not interested in converting to SaaS for a number of reasons. "A lot of people had security concerns for moving everything into the cloud, especially for scanning sensitive information," he said: "A lot of people didn't want the hassle of tearing down what they already built. Others didn't want to pay for it."

[3] Tractor Supply Company (NASDAQ: TSCO) is an American chain store that sells home improvement, agriculture, lawn and garden maintenance, livestock, equine and pet care equipment and supplies. As of 2026, the company had 2,446 stores. For the full year 2026, TSCO reported total annual revenues of $15.52 billion and has over 52,000 employees.

[4] Pilot Travel Centers LLC, doing business as Pilot Flying J, is one of the largest privately-owned companies in the U.S. and a major subsidiary Berkshire Hathaway. It is a North American chain of truck stops in the United States and Canada. Pilot Flying J is the largest purveyor of over-the-road diesel fuel in the United States. Pilot Flying J also is known as the largest Travel Center chain in the country with over 750 locations under the Pilot, Flying J, and Mr. Fuel brands. Pilot Flying J has over 30,000 employees and generates roughly $42.2 billion in annual revenue, with the vast majority of its income driven by diesel fuel sales. It is one of the largest privately-owned companies in the U.S. and a major subsidiary Berkshire Hathaway.

123. FE1 noted that on-prem customers had their own computer equipment that housed the software and their data on their own premises. For large customers, this could be extensive amounts of equipment for which the company invested heavily financially.

124. "When we first started the rollout (of SaaS cloud), they (Varonis) wanted a 20 to 25 percent uplift," FE1 said. When Varonis told customers they had to forgo their own on-site technical infrastructure for Varonis' cloud platform, many balked, especially when they heard the annual subscription cost would increase by 20 to 25 percent, FE1 said.

125. When Varonis began to push its on-premises customers to SaaS in 2025, the Company was aiming for an 80 percent conversion rate, but the reality proved to be more sluggish, FE1 said. When FE1 left Varonis in late October 2025, he had only converted about 36 percent of his portfolio of customers. He said his co-workers were not having much more success. "Most of the (sales) people I talked to were between 30 and 60 percent," he said. That was significantly lower than what Varonis was expecting, FE1 said: "They weren't able to convert as many people as they thought they could," FE1 said. "It was harder than they anticipated."

126. FE8 likewise said that as a Corporate Sales Engineer, his job was to convert his 50 to 60 small to medium-sized businesses from on-premises subscriptions to SaaS. FE8 said only about half of his 60 businesses converted to SaaS from on-prem.

127. FE1 said by about mid-Q2, the sales team was recognizing that customers were not going to be an easy sell on SaaS. "Halfway through Q2, it started to become apparent it was a little bit more than trying to convince them with proof of value and pushing them to it," he said.

128. Moreover, many of the on-prem customers that ***did*** convert in Q1 and Q2 2025 were customers whose contract was not up for renewal until after Q2 2025. That is, Varonis was

"pulling in" conversions from future quarters, leaving for Q3 and Q4 only the customers who refused or were resistant to converting.

129. FE1 stated that in Q1 and Q2 2025, about 50 percent of Varonis' conversions were from customers whose on-prem contract was not set to expire until sometime later in the year. He stated the customers who converted before their renewals usually were approaching the end of their contract in 2025 but customers with contracts that didn't expire until 2026 and 2027 "weren't entertaining" the idea of converting, he said.

### F. Varonis Eliminates Price "Uplift" Company-Wide To Incentivize Resistant Customers

130. By April 2025 (mid-Q2 2025), the Company made the no-cost conversion a Company-wide policy.

131. According to FE2, faced with pushback from customers who did not want to switch to SaaS due to not wanting to pay the increased costs, Varonis began to offer customers the SaaS contract at no additional cost from their previous on-prem contract. By April, the Company began offering the SaaS contracts at the same price as their on-prem contracts. FE2 said that word came down from higher levels: "If it takes just moving them at cost, move them at cost."

132. FE2 heard from the customer account managers he worked with (J.D. Parady and Kristina Rith), who were responsible for closing the new SaaS contracts with existing customers, that the permission to switch customers at no additional cost came from Chris Prangley, Regional VP of Sales – West. "He would be the one who would approve it," FE2 said.

133. FE1 said by about mid-Q2, the Company began to realize the only way to convince some customers to switch was by significantly lowering the cost. Instead of the 20 to 25 percent increase in annual subscription rate for SaaS, Varonis was allowing on-remise customers to convert to SaaS at the same annual rate they had been paying for on-prem. FE1 said the no

additional cost conversions were approved by Director of Sales Alex Beardsley, but FE1 thinks the approvals likely came from a higher level.

134. FE3 similarly confirmed that by mid-2025, “everyone was complaining” and the entire sales staff was aware of the option for customers to renew at no additional cost, so he concluded the direction came from a high level. “Yaki (Faitelson), everyone knew about the flat conversions – that was being implemented into the process,” he said. FE3 said his manager told him and his co-workers that they had the option to offer on-prem customers a “flat conversation” to secure the switch to SaaS. Varonis began to allow salespeople to convert on-prem customers to SaaS at no additional cost for the annual rate.

135. FE3 said flat conversion had to be approved by Varonis’ Deal Desk, which was in the finance department and oversaw discounting for contracts. The approvals from the Deal Desk, however, were essentially automatic if the customer had stated they would not renew with Varonis if they had to pay more for SaaS. “As long as the customer referenced if they had to pay more, they were leaving, they were approved,” FE3 said. FE3 said the Deal Desk worked directly with CFO Guy Melamed, and that the Global Director of the Deal Desk and Sales Operations, Tom Zaki, reported to Melamed. “Guy (Melamed) would have been involved in the approval process,” FE3 said. “He would have been involved in the discussions.”

136. Like other former employees, FE5 said that before the end of Q2 2025, throughout the entire Company, it was an option for existing on-prem customers to convert to SaaS at no additional cost before the end of Q2.

### G. Even With Threats And Incentives Customers Continue To Refuse to Convert

137. Throughout 2025 until he left in May, FE2 attended monthly meetings with his manager, Mike Cady, and Cady’s boss, Paul Browning. The account managers FE2 supported also attended. During those meetings, the group discussed their progress on transitioning all existing

customers to SaaS contracts, he said. FE2 said on his progress reports, he informed his superiors that a number of customers continued to resist switching. He said the customers either did not have the funds to pay more, and/or some did not want to move their data to the cloud. He said some of these customer accounts were multimillion dollar annual contracts.

138. FE2 said he was aware of a few accounts he managed that were not going to move to SaaS. He called that some of these contracts in the mid-six figure range were looking for other solutions from competitors who would support on-premises data maintenance. When FE2 left [in May 2025], a few mid-size contracts and one multimillion dollar contract were still holding out on transitioning to Varonis' SaaS cloud services. "It was a bold strategy," FE said of Varonis. "It was a bold decision to say we're no longer supporting. Once your contract is done, you either move (to SaaS) or you're done." When FE2 resigned from Varonis, he had a few customers who seemed determined not to switch to Varonis' SaaS service. "I knew of a handful of accounts -- they are not renewing," he said. He said the accounts were low six to mid-six figure annual revenue accounts, and one multimillion dollar deal "that didn't move."

139. FE6 said some customers declined to make the switch to cloud even when offered a no-cost conversion. "Some customers were not switching over," he said. "I had one financial customer who we told we will bringing you over to SaaS (at cost)," he said. "They didn't do it. They didn't renew."

140. Similarly, FE1 said a number of customers who did not want to (or could not) put their data on the cloud chose instead to give up their subscriptions to Varonis. "I had a few that wouldn't convert," he said. "They went somewhere else." FE1 recalled he had at least three or four customers who chose to leave Varonis rather than move to the cloud. He said one of the companies

represented about $110,000 in annual revenue. The others were between $60,000 and $100,000 each.

141. FE7 recalled a SaaS presentation he and other Varonis employees gave to an on-premises customer in mid-August 2025. After the meeting, the Varonis team went to lunch along with a representative from the reseller. During the meeting, Justin Wilkes, the VP of Systems Engineering at Varonis, told the group that the "quarter was not looking good" and "it was really rough right now," FE7 recalled. "That told me as we moved into September, I already knew things were not looking good," he said.

142. FE7 said that throughout September 2025, Varonis required all sales managers, directors, and regional VPs in the "enterprise" division to attend a sales forecast conference call at 8am EST to discuss pending and potential deals. Witnessing the intense pressure put on sales during the meetings, it was clear to FE7 that the Company leadership was concerned about revenues for Q3 2025. FE7 said Sam Wethje, VP of Sales for North America, led the meetings. Grep Pomeroy, SVP of Worldwide Sales, and Jim O'Boyle, Vice Chairman of Sales, also sometimes joined the call, FE7 said.

143. During the meetings, leadership grilled members of the sales team daily about their pending deals, questioning when the deals would close and what sales reps were doing to close them, FE7 said. FE7 said the sales team was asked to talk about the same deals day after day after day, even when there were no changes to report. FE7 only had two deals pending in September 2025, and he was asked to talk about them almost every day. "To get that type of grilling like that daily, it was ridiculous," FE7 said.

144. FE7, who has more than 20 years in software sales, said daily forecast meetings for an entire month was highly unusual for a company. In Q1 and Q2, FE7 said Varonis had daily

meetings in the last week or two of the quarter, but not for the whole month – another sign that leadership was particularly concerned about sales in Q3.

**H. The Vast Majority Of The Federal Business Would Never Convert To SaaS**

145. During FE9's time at Varonis, revenues from federal government contracts was between $50 million and $70 million annually. Most of those contracts were for on-premises systems. FE9's focus was on Department of Defense customers, which included the different divisions and agencies of the military. He estimated that DOD represented about $30 million in annual revenue for Varonis.

146. When Varonis started efforts to convert on-premises customers to SaaS, the federal sales team was able to transition a number of civilian federal government agencies because Varonis had obtained a FedRAMP cloud security certification from the U.S. government – something that is required for federal agencies to put their data on a cloud platform, FE9 said.

147. FE9 explained that FedRamp certifications have different security levels depending on the type of data that will be stored. Varonis only had a moderate level certification, which allowed some federal agencies to convert to cloud, but the certification was not high enough for other federal agencies, particularly the DOD divisions to use Varonis' cloud platform, FE9 said.

148. FE9 was aware that his manager, Chad Mason, VP of U.S. Federal Sales, spoke to Varonis leadership about the need to obtain a much higher level certification if they wanted to secure more SaaS contracts with the DOD. Mason told the DOD sales team that he was having these conversations with CEO Yakov Faitelson as well as other high-level executives during 2024 and 2025, FE9 said. FE9 shared what Mason told him and the DOD sales team: Mason explained to Varonis leadership that DOD customers would not be able to convert to SaaS cloud service with the moderate FedRAMP certification. Faitelson, however, did not want to invest the significant amount of money required to obtain higher levels of security certification for its cloud platform.

Rather, Faitelson complained that the Company had already invested a lot into obtaining its current FedRamp certification, which was not resulting in the additional sales he expected. Mason pointed out that the certification was not the level needed for DOD database, which was why sales were lagging.

149. FE9 recalled that Mason and the federal division had been telling Varonis leadership for more than a year that they would not be able to secure SaaS contracts with DOD – renewals or new deals – without the higher security certifications. "We in DOD – it was zero," he said of SaaS conversions and sales. "We cannot do it at all." FE9 noted that "99.9 percent" of DOD customers were precluded from converting to SaaS because their data was too sensitive to put on Varonis' cloud platform at current certification levels.

150. FE9 said five or six of his DOD customers did not renew their on-premises contracts in 2025, which were valued at about a total of $2 million annually. He said Varonis also lost or was unable to close a number of DOD deals that had been in discussions for multiple months and sometimes years:

- An Army contract worth $22 million was supposed to close in 2025 but did not.
- A military health agency contract worth $4 million was supposed to close in 2025 but did not.
- A government agency contract for an on-premises system worth more than $10 million was about to close just as the Company announced it was ending support for on-premises systems. Varonis told the sales rep to turn down the contract.

151. FE9 said the federal team – both the civilian and DOD divisions – had a sales forecast conference call every Friday. He said Mason, the VP of U.S. Federal Sales, lead the meetings, during which the sales reps had a round robin to report on the status of their potential deals and customer renewals.

152. FE9 was aware from Mason's comments in the meetings that Mason got on another conference call afterwards with top leadership to report on the status of his division. FE9 understood that Faitelson attended at least some of these higher level meetings along with the leadership of other sales divisions.

153. In the last six months of his tenure, FE9 noticed the pressure increase on Mason from top leadership. "It was very obvious in the last six months that things were going very south," he said. "The pressure put on Chad (Mason) was very unfair." "It all felt like fluff the last six month."

154. FE10 was responsible for selling the software to federal government agencies. "I started out selling to the Navy, then transitioned to the Defense Health Agency, then to the entire Fourth Estate," he said. "I traveled almost every week to all my different customers. On-prem subscriptions renew every year. You pay for the subscription for the license, and then if you buy professional services – someone to come, configure, roll out the software, and set it up – that would be something that's different every year because you don't necessarily need it every year."

155. In 2019 or 2020, Varonis announced it wanted to start switching all of its customers to SAAS, FE10 said. Regarding the switch, he said, "we can't do that in the public sector," and "[they've been] heavily unsuccessful in switching the federal customers to SAAS."

156. FE10 said he didn't sell SaaS. "SaaS is only being sold by commercial people, and federal could only sell on-premises because they can't support that [SAAS] in the government," he said.

157. Varonis prices the on-premises subscriptions based on the number of users, FE10 said. "It's all modular, so it depends on which module you're buying," he said. "Each module has different capabilities, so it depends on what the customer needs. I had one customer that was a

Navy ship, which is pretty small, but had 1,000 users with multiple networks, and every single module we had, and their total was $1 million a year," he said.

158. FE10 said his former Varonis clients have been reaching out to him since he left to ask his advice on which systems they should get to replace Varonis' on-premises system. "They have to pull out everything because it's not going to be supported [by Varonis] after this year," he said. "After spending so much time getting this deployed with customers, now it's gone to nothing because they have to rip everything out, so even customers who would plan on renewing can't because they don't have that option. I think it's a stupid business decision because the federal government spends so much money. It just takes time. A lot of time."

159. FE11 said at least 80 percent of the civilian public sector business at Varonis was on-premises subscriptions. He likewise noted that federal government agencies have strict requirements for data protection, which are even more strict for cloud platforms. Most federal agencies cannot procure software and data storage on a cloud service unless the platform has FedRAMP authorization from the government. To obtain FedRAMP, a cloud service provider must invest millions to meet the federal government's cloud security requirements, FE11 said. FE11 said that Varonis not having FedRAMP limited federal agencies ability to move to cloud contracts.

160. FE11 likewise said that Varonis had, since releasing its cloud platform, consistently stated it had no plans to jump through the hoops of obtaining the DOD's Impact Level authorization required by defense contracts. He said Impact Level authorization is more extensive than FedRAMP and defense departments require it for use of cloud service.

161. FE11 was aware of two multimillion-dollar Department of Defense deals that were forecast for 2025. Neither closed. He recalled one was an $8 million contract with the U.S. Army. FE11 said the other DOD contract that did not close in 2025 was for $5 million.

162. When asked about why the Company had to adjust its ARR guidance for the 2025 year, FE4 said he heard from former co-workers in federal sales who were still at the Company throughout much of 2025 that it was due to the loss of a number of big federal contracts. FE4 likewise said the Company may have lost the contracts because many federal agencies liked having their data on their premises and did not want to move their data to the cloud, stating that the federal government has strict data security requirements for cloud platform, and a cloud services vendor must meet those requirements via a federal security check program called FedRAMP authorization. A cloud services vendor must have FedRAMP authorization to qualify for federal contracts. FE11 said he did not think the company ever received "full" FedRAMP authorization. From what he recalled, the company only received what he called "FedRAMP light."

163. FE6 likewise said that Varonis' tough talk about no longer supporting on-premises subscription software impacted the federal contracts renewal rates even more than commercial contracts. He also heard that some federal contracts were unable to switch to Varonis' SaaS cloud because the Company's cloud platform did not have the level of security needed for government databases. The federal government requires a cloud service to have what's called FedRAMP authorization to be eligible to host government databases. To obtain FedRAMP authorization, the cloud service must show it meets the federal government's security requirements. FE6 said FedRAMP authorization comes at different security levels, and that Varonis did not have the highest level, which is called FedRAMP High. Instead, Varonis' cloud platform had FedRAMP Moderate, he said. FE6 stated that Varonis likely lost federal contracts when the Company began

insisting that on-premises customers switch to SaaS because Varonis' cloud platform did not have the FedRAMP High authorization that some of these federal contracts required.

164. FE1 also said commercial customers who had contracts with the federal government were particularly resistant to converting to the cloud. Even though the customer was a commercial business, a contract with the federal government limited the customer's ability to move government data to the cloud.

165. FE5 was aware that the U.S. federal government sales team had been struggling to convert existing on-prem customers to SaaS. He agreed that as Varonis lost federal contracts, the revenue impact those lost contracts represented could have undermined growth in ARR. FE5 did not know the details, but he recalled hearing about how Varonis' cloud platform did not have the level of security certification needed for federal government databases, which he thinks could have precluded some of these customers from converting to Varonis' SaaS services – leading to lost contracts.

### I. Faitelson Was Aware Of And Personally Involved In Conversions

166. FE1 said the Company tracked its sales and revenues in salesforce.com. He said managers could view results of everyone on the midmarket sector. FE1 was pretty confident that higher levels of sales management could see the salesforce.com reports for their entire teams. FE1 recalled an internal report that he received regularly that showed his conversion rate for shifting on-premises customers to SaaS. He recalled the report showed all the customers in his portfolio, which type of software license the customer had (perpetual license, on-premises subscription, or SaaS cloud), the revenue expected for 2025, and the revenue expected for 2026. FE1 said if the report showed zero dollars for 2026, that meant the customer had gone elsewhere instead of switch to the cloud.

167. FE1 was confident Melamed and Faitelson were looking regularly at revenue reports. "They all have the numbers," he said. "I have no doubt in my mind they (the CEO and CFO) had numbers in front of them of sales closed."

168. FE1 said he and his co-workers regularly informed their sales managers that many customers were resistant to converting to the SaaS cloud platform. He said his team met weekly with their managers during which they discussed which customers were willing to convert at what price, which were resistant, and which customers Varonis was at risk of losing. FE1 said the sales division was fully aware that there was widespread resistance to conversion from many customers.

169. FE2 heard from the salespeople and customer account managers he supported that Faitelson paid particular attention to large deals. FE2 said the salespeople and account managers working with a multimillion-dollar accounts would mention to him sometimes that Faitelson attended meetings with the high dollar customer. "I was told by my account reps he was flying out to be in a business review a lot of times," FE2 said. He recalled Faitelson also attended "deal wrap ups" or tech demos when the Varonis team was "doing a proof of concept on SaaS" for customers.

170. FE6 said that when some customers balked, CEO Yakov Faitelson personally involved himself in the conversation with the customer about switching: "Yaki got involved to move them over to SaaS," he said, referring to Faitelson by his nickname.

171. FE6 got the impression that the CEO was paying close attention to sales and revenue. "Varonis is an incredibly micromanaged sales organization," he said. "Every single deal – the regional director, the VP of sales, everybody got wind of deals because Yaki and the leader of all of sales, Greg Pomeroy, requested it," he said. FE6 said he became aware that top leadership was requesting information about all deals from conversations he had with his own sales managers, who were requesting the information from FE6.

172. FE6 said Faitelson was not involved in any of his accounts that he's aware of, but FE6 recalled Faitelson's involvement in another sales engineer's account. FE6 said the account, which was based in the Northeast U.S., belonged to one of Varonis' highest grossing sales representatives. FE6 thinks the customer was either a large healthcare company or financial institution. FE6 said he heard from both the sales representative and the sales engineer on the account, "that Yaki got involved to get them to move to SaaS." FE6 also heard about Faitelson's involvement in the account from his manager, Joe Geis, Sales Engineering Director – Northeast.

## IV. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

173. Plaintiffs allege that the statements highlighted in ***bold*** within this Section were materially false, misleading, and omitted to disclose material information. Each statement attributed to the Individual Defendants during the Class Period was also made by Defendant Varonis because in each such statement the Individual Defendants were speaking on behalf of Varonis. The reference to a statement being "misleading" includes statements that are misleading due to the omission of information.

*February 4, 2025*

174. On February 4, 2025, Varonis reported its fourth quarter fiscal 2024 results and conducted a same day earnings call to discuss both the results and forward-looking projections.

175. During the earnings call, Defendant Faitelson discussed Varonis' progress in converting on-prem users to the Company's SaaS offering, stating, "We still have many existing customers to convert to our SaaS platforms, but ***it is clear that we are well on our way to becoming a SaaS company***," and "***our existing customer convergence continue in a healthy way***"

176. Defendant Melamed reiterated the Company's positivity toward conversions while also highlighting the financial impact of them, stating, "***Conversions of self-hosted customers were also very strong because customers see the value of SaaS and MDDR, which help customers***

***achieve their goal with very little effort as we do almost all of the work for them***," and highlighting once again, "***In the fourth quarter, we had a huge volume of conversions***" and the "***healthy uplift we recognize upon conversion***."

177. Defendant Melamed further highlighted the Varonis' guidance for fiscal 2025, providing, in pertinent part, the following:

> For the ***full year 2025, we expect ARR of $737 million to $745 million, representing growth of 15% to 16%; free cash flow of $120 million to $125 million***; total revenues of $610 million to $625 million, representing growth of 11% to 13%; non-GAAP operating income of $0.5 million to $10.5 million; non-GAAP net income per diluted share in the range of $0.13 to $0.17. This assumes 137.5 million diluted shares outstanding.

178. The question-and-answer portion followed, during which almost every question concerned the conversion of On-prem customers to Saas. Defendants articulated their detailed knowledge of the status of the conversion process and emphasized their confidence in continuing to convert On-prem customers to the SaaS offering.

179. Michael Steven Richards – RBC Capital Markets – Senior Associate asked, "could you talk about maybe where there might be some conservative assumptions around…conversions of the base? And how are you accelerating that Phase 2? Is that going to be through a [carrot and stick] approach? Or are we looking at sales incentives? Just any detail on that would be great." Melamed responded:

> ***In terms of the conversions, we saw a lot of success in 2024 converting our existing customers to SaaS.*** And during the process of doing so, we learned a lot. So when we look at those learnings, we're making some strategic investments in sales and customer success, support and legal to support the transition, and ***we really plan to start our renewal process even earlier this year to allow for more time to process the additional paperwork associated with moving to SaaS***. ***So overall, we feel very good about the opportunity to accelerate our SaaS transition*** and enable our company to realize the benefit of SaaS a year earlier than our previous expectations and 2 years earlier than our initial plan.

180. Hamza Fodderwala – Morgan Stanley – Equity Analyst asked: I'm a little confused by your earlier comments on the renewal process. Are you talking about pulling forward renewal deals? So that way, you can get more conversion to SaaS from the existing customer base?" Melamed outright denied that they were renewing any customers before their contracts were up for renewal, stating that they were merely starting conversations early because the paperwork and process took longer:

> ***So first of all, in terms of the renewals, we're talking about the actual renewals that expire within the year. We want to make sure that we're ahead of the game, and then we're talking to customers about the benefits of SaaS. It's a no-brainer for them to move*. *But sometimes, there's additional paperwork that is part of the process.*** And obviously, when you move from on-prem to SaaS, it's a different checklist from a security perspective.
>
> ***So there's a lot of documentation. It's not a technological challenge. It's more of a documentational challenge that we want to be ahead of. And that's why we want to start the conversation with customers that are about to renew earlier than what we did last year. So that kind of takes care of that component***.

181. Brian Lee Essex – JPMorgan Chase & Co – Executive Director of U.S. Software Equity Research asked:

> Guy or Yaki, I think we've previously talked about Phase 1 versus Phase 2, and Phase 2 being kind of the stick phase where you push customers or incentivize them a little more aggressively to convert. ***Could you help us understand as you're pursuing more aggressive incentives to bring customers over to the SaaS platform, how should we get comfortable or how do investors get comfortable that you won't see accelerated attrition from the platform? And what are those conversations like?*** I think you talked about learnings from what you've seen over the past year or so. But how can we kind of maybe get some -- a little bit of insight from those learnings to get us comfortable for durability of the customer base on your platform?

Melamed responded:

> ***So we definitely took a lot of the learnings from our previous transition. And I can tell you that one of the things that we have put at the forefront of everything we do is the benefit for the customer and how -- what is better for them.*** And one of the things that we're seeing is that the SaaS product is by far a better product for them, gives them better protection. And the MDDR offering is not there with the on-prem subscription. It's only there with the SaaS offerings, and it allows us to do a lot

> of the work for them and make sure that our - - our platform is the one that's provided in an automated way, a lot of those benefits.
>
> So when we think about kind of the move, we want to make sure that we do it in the right way. And with that customer and kind of the way we're thinking about it, we've also -- for 2025, made sure that from a commission perspective, we're incentivizing our sales team on the conversions without neglecting new business. So the new business is at the forefront of everything, but we're absolutely making sure that it's in everyone's best interest, and it's a win-win to make sure that they -we complete the transition in 2025.

182. Additionally, Defendants pushed back against the notion that they were having difficulty converting existing users to the SaaS. Brian Lee Essex – JPMorgan Chase & Co – Executive Director of U.S. Software Equity Research asked: "***[H]ave you seen resistance from customers? Or is it a lack of resistance that maybe gives you confidence that you can maybe go more aggressively about converting them to the SaaS platform and MDDR***?" Faitelson indicated that the Company was experiencing no resistance to converting from customers:

> ***As you can see, it moved much faster than we thought. And the MDDR is such a strong offering and all the remediation automation that we have in the cloud and value is everything customers get value frictionless way, then you can expand.*** And you see all these massive data stores and almost every big breach is a data breach. This is what organization wants to avoid. You go to a CISO today, we'll tell you, you want to make sure you don't have a data breach, to make sure I don't have compliance time and I want to make sure of doing this in an effortless way with a relatively lean team. And this is what we are doing for them. ***But in order to do it, we need to do it in the cloud. This is why we just put -- we are accelerating it. We want to make sure that we are adding value to all of our customers, and in order to do that, they need to be in SaaS.***

183. Joel P. Fishbein – Truist Securities, Inc. – MD of Software and Cloud Technology asked: "Guy, just for you. I'd love some more color and if you can quantify it in any way, the backlog that you currently have and how the pipeline is? I understand you're having some challenges via the conversions, but I just want to understand the health around that pipeline and the backlog?" Melamed denied any challenges regarding conversions:

> I wouldn't say that. When we talk about the conversions, I think they're weighing on the growth when you look at kind of the new business behavior. But I wouldn't

> say that it's not something that we can deal with. When you look at the pipeline, we have a healthy pipeline. ***We have a lot of conversations with our existing customers on the conversion to SaaS. We're trying to start the process, as I mentioned before, earlier than what we would otherwise. And I think in terms of setting ourselves up for 2025, we feel very good with where we are today, both on the new customer side and on the existing customer conversion***.

184. Roger Foley Boyd – UBS Investment Bank – Analyst asked:

> Guy, ***I wanted to come back to conversions***…***[H]as there been any change to how you're pricing those SaaS conversions***?

Melamade flatly denied that the Company was reducing the pricing of SaaS for customers converting:

> ***No, we don't see any change in terms of the pricing. We're seeing healthy uplift on the conversions themselves. We talked a lot about the fact that the price list of SaaS is 25% to 30% higher than the on-prem subscription. We're seeing very healthy conversions in terms of pricing. We feel good about the ability to convert our customers…So we're very pleased with our ability to convert***. ***The pricing is holding very well***. We feel that once we convert our customers, there's an additional opportunity to sell them more platforms. ***It's in their benefit to move to SaaS***, they'll be better protected and it's also better for us. So it's a win-win for everyone. ***And that's why we're still happy with that with where we are so far, and we're very optimistic with going into 2025***.

185. Jason Ader – William Blair – Analyst asked: "I'm struggling a little bit on the ARR headwinds. ***I just wanted to make sure I fully understand because there is an uplift in a normal SaaS conversion, correct, like a price uplift when you convert somebody. Can you just talk about the sort of the puts and takes there because it seems like even with the price uplift, you're hitting some headwinds***." Melamed responded:

> So we talked a lot about the fact that when you look at kind of ***the uplift, it's 25%, 30% when we do the conversions***. But the one thing to keep in mind is that we're approximately a third of our existing customers that converted over a two-year period…***So yes, we are getting that uplift and we are -- we're seeing very strong pricing from the uplift***. But at the end of the day, we only converted approximately a third of our customers over a two-year period. And that's part of the reason we want to accelerate our conversions in 2025 and be done with the transition in one more year.

186. Joshua Tilton – Wolfe Research – Analyst asked:

> ***I apologize to beat a dead horse here, but on this decision to kind of accelerate the transitions, many times on the call, you pointed out you guys are already tracking ahead of your initial plan to convert to SaaS.*** So I guess, I'm trying to understand, ***did something change this quarter that's making conversions more challenging than they were previously to the point where you felt like you needed to incentivize an acceleration in the rest of the transitions?***
>
> And then my second part of the question is just ***how contingent or how necessary is it for you to actually accelerate the transitions in 2025 in order for you to hit the ARR guidance that you gave us tonight?***

Melamed denied that the Company was seeing any resistance to conversion from customers:

> ***I think when you look at the conversions, I don't think there's anything new in what we're seeing now versus what we said versus what we said over the last two quarters.***

187. Defendants' statements referenced in ¶¶175-186 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) customers were resisting and outright refusing to convert to SaaS; (ii) the conversion rate was significantly below the Company's prior expectations; (iii) the Company was not merely starting conversion conversations early with customers in anticipation of converting. Rather the Company was converting customer contracts to SaaS prior to the quarter in which they were up for renewal, thereby inflating the current conversion figures and masking that many customers had refused to convert to SaaS and the remaining customers were heavily weighted toward resistant and refusing customers; (iv) the Company was converting customers to SaaS at zero price uplift; (v) customers only had the option to convert to SaaS – they could not renew their on-premises contract; (vi) many federal customers (which were primarily up for renewal in Q3 2025), especially those in the DoD, would never convert to SaaS and would have to go to a competitor because Varonis did not have and would never have sufficient FedRAMP certification level and would not renew on-premises contracts; and (vii) as a result, the Company's guidance lacked any reasonable basis.

*March 3, 2025*

188. On March 3, 2025, Melamed and Brian Vecci, Chief Technology Officer participated in the Morgan Stanley US Technology, Media & Telecom Conference 2025

189. During the conference Melamed discussed the price "uplift" from on-prem to SaaS. Hamza Fodderwala, analyst with Morgan Stanley mentioned "So you're saying we know the on-prem to SaaS uplift has been I believe 20% to 30% in that range." As they continued to discuss the price "uplift" from on-prem to SaaS, Melamed confirmed the 20% to 30% uplift from the conversion, stating, "***we're getting that uplift from on prem to SaaS***."

190. Defendants' statements referenced in ¶189 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that the Company was converting customers to SaaS at zero price uplift.

*May 6, 2025*

191. On May 6, 2025, Varonis conducted its first quarter fiscal 2025 earnings call, during which Defendant Faitelson spoke positively about the Company's ability to convert its existing on-prem client base to SaaS, stating, in pertinent part:

> ***The reason we are accelerating this transition is because the strong demand for our SaaS solution and the benefits to our customers and our company.***
>
> …
>
> ***We also continue to see very healthy customer interest in safely deploying Copilot and other generative AI tools, which is serving as a reason for…existing [customers] to convert to our SaaS platform…Varonis SaaS is a no-brainer for our customers because of the value that it offers.***
>
> ***In the first quarter, we were able to convert existing customers to SaaS <u>more effectively</u> because of the lessons we learned last year and the additional investments that we made in our team.***
>
> …

> While new customers drove most of our momentum this quarter, ***we are also seeing strong demand from existing customers looking to convert to our SaaS platform and expand their protection to cover new critical cloud data stores*** I mentioned a few moments ago.

192. Melamed reiterated much of the same positivity and highlighted Varonis' increased full-year guidance, stating:

> Our Q1 results demonstrate sustained new customer momentum ***and that the investments we made in our team and lessons we learned regarding existing customer conversions is working***.
>
> …
>
> ***For the full year 2025, we now expect ARR of $742 million to $750 million, representing growth of 16% to 17%. Free cash flow of $120 million to $125 million.*** Total revenues of $610 million to $625 million, representing growth of 11% to 13%. Non-GAAP operating income of $0.5 million to $10.5 million, non-GAAP net income per diluted share in the range of $0.14 to $0.17. This assumes 135.8 million diluted shares outstanding.

193. In the question-and-answer segment that followed, Melamed highlighted the strength of the Company's conversions. Joseph Anthony Gallo – Jefferies LLC – Senior Enterprise & Security Software Analyst asked: "Last quarter, you mentioned elongation of conversion cycle times. Has that length of cycle time for conversions changed in any way? And then how is the gross retention rates in ASP [Average Sales Price] upside recognized again for those customers?" Melamed responded:

> ***This to a lot of lessons that we have learned from the conversion process last year, and we are trying to implement them starting this year. I think we've done a very good job. And when you look at kind of the conversions that we had in Q1 they were really strong. And I think all of the investments and the lessons learned were implemented in a way that we're happy to kind of to start the year with.***
>
> When you look at the gross retention rate, when you look at the renewal rates, they're all very strong. We feel good about where we are and what we're seeing. And we talked a lot about the fact that ***SaaS is purely a better product and therefore, we're seeing our existing customers try it and then want to buy more and be better protected.***

194. Later in the Q&A, Melamed spoke to the federal conversion rate, highlighting that the third quarter is the largest quarter for Varonis' federal business contribution and that getting the FedRAMP certification would open long-term opportunity for the federal business. Shaul Eyal – TD Cowen – MD & Senior Analyst asked, "Guy or Yaki, DOGE specifically -- I'm not talking about tariffs, et cetera, but DOGE specifically, have you seen anything emerging in this quarter?" Melamed responded:

> When we look at federal and I want to remind everyone, the federal business for us is still relatively small, about 5% of total company ARR. And when we look at kind of the -- when we look at the contribution in Q1, Q1 is not considered a large quarter for them. Their largest quarter is Q3.
>
> …
>
> ***[W]e are very happy with kind of the progress of the FedRAMP certification. It's really as progressing as planned, and we hope to get it in the next few months. So we definitely believe in that long-term opportunity in that vertical. So that kind of relates to the federal question.***

195. Defendants' statements referenced in ¶¶191-194 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) customers were resisting and outright refusing to convert to SaaS; (ii) the conversion rate was significantly below the Company's prior expectations; (iii) the Company was not merely starting conversion conversations early with customers in anticipation of converting. Rather the Company was converting customer contracts to SaaS prior to the quarter in which they were up for renewal, thereby inflating the current conversion figures and masking that many customers had refused to convert to SaaS and the remaining customers were heavily weighted toward resistant and refusing customers; (iv) the Company was converting customers to SaaS at zero price uplift; (v) customers only had the option to convert to SaaS – they could not renew their on-premises contract; (vi) many federal customers (which were primarily up for renewal in Q3 2025), especially those in the DoD, would never convert to SaaS and would have to go to a competitor because Varonis did not have

and would never have sufficient FedRAMP certification level and would not renew on-premises contracts; and (vii) as a result, the Company's guidance lacked any reasonable basis.

*May 28, 2025*

196. On May 28, 2025, Melamed and David Gibson, Senior VP;Strategic Programs participated in the TD Cowen 53rd Annual Technology, Media & Telecom Conference.

197. A participant asked about the price uplift for conversions: "And like for like customers, you see them bought the whole price of purchase going up as they move to SaaS." Melamed responded: "***So the price list apples-to-apples, SaaS versus on Prem is 25%-30% higher***. What we are seeing is that some of the customers are buying the larger platform."

198. Defendants' statements referenced in ¶197 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that the Company was converting customers to SaaS at zero price uplift.

*June 3, 2025*

199. On June 3, 2025, Melamed, David Gibson and David Bass, and Executive Vice President of Engineering & Chief Technical Officer participated in the William Blair 45th Annual Growth Stock Conference. An analyst asked "what's the uplift versus the on-prem?" Melamed responded: "***Apples to apples, if you're buying the same number of licenses, it's a 25%, 30% uplift***. The total cost of ownership for customers is lower still, even with that uplift, because they can save on the headcount and they can save on the hardware. ***But in some cases, we see customers actually consuming more of the product, so they pay more than that 25%, 30% uplift***."

200. Defendants' statements referenced in ¶199 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that the Company was converting customers to SaaS at zero price uplift.

*July 29, 2025*

201. On July 29, 2025, Varonis issued its press release reporting second quarter results. During the same-day earnings call, Defendant Faitelson again highlighted the "strong demand" for Varonis' SaaS platform from "both new ***and existing*** customers, primarily due to the superior experience that Varonis SaaS and MDDR offers," further noting that Varonis "again saw strong demand from existing customers looking to convert to our SaaS platform."

202. Defendant Faitelson further highlighted Varonis' federal authorization, stating, in pertinent part:

> ***I'm also proud to announce that we achieved the FedRAMP Authorization, enabling us to offer our entire SaaS platforms to the federal sector. Demand from both new and existing customers looking to protect cloud environments with Varonis continue to positively inflect and is becoming a material contributor to our business***.
>
> This is driven by the investments we have made in our platform to expand our use cases, going wider and deeper and entering new markets, including DSPM, our ability to protect cloud data represents a significant untapped growth opportunity for us ***and transitioning our customers to our SaaS delivery model is helping us unlock this market's potential***.

203. Defendant Faitelson reiterated: "***We again saw strong demand from existing customers looking to convert to our SaaS platform.***"

204. Defendant Melamed then highlighted the Company's updated fiscal 2025 guidance, pertinently providing the following:

> Turning now to our updated 2025 guidance in more detail. For the ***third quarter of 2025, we expect total revenues of $163 million to $168 million, representing growth of 10% to 13%.*** Non-GAAP operating income of $4 million to $7 million and non-GAAP net income per diluted share in the range of $0.07 to $0.08. This assumes 134 million diluted shares outstanding.

> ***For the full year 2025, we now expect ARR of $748 million to $754 million, representing growth of 17%. Free cash flow of $120 million to $125 million,*** total revenues of $616 million to $628 million, representing growth of 12% and to 14%. Non-GAAP operating income of breakeven to $6 million, non-GAAP net income per diluted share in the range of $0.16 to $0.18. This assumes 134.7 million diluted shares outstanding.

205. During the question-and-answer period that followed, Defendants reiterated the strength of the conversion process. Melamed stated:

> So, ***when you look at the Q2 results***, they were driven by strong new customers again. And we talked a lot about how SaaS opens up the opportunity to sell to additional customers. We saw that continue in Q2. ***We also saw the conversions and existing customers contributing nicely***.

206. Joshua Tilton – Wolfe Research – Analyst asked: "***on the conversion piece specifically, you guys said it contributed nicely to the quarter, but can you just maybe give us an update on how the accelerated conversion is going relative to your plan? Are you tracking in line, ahead, or maybe behind?***" Melamed responded:

> So, I'll start with the second part. ***When we look at the conversions, the fact that we're increasing our SaaS mix from 80% to 82% and actually started the year with a full year guidance of 78% is an indication of things going very well. We knew that we could improve the conversion component in 2025***, and there were a lot of lessons learned that we took from 2024 and implemented as part of our strategy for 2025***. So, I can say that we're very happy. We're not -- I wouldn't say that we're shocked by how good it's going. We're very happy, and we knew that we could do better than 2024***.

207. Defendants also discussed their expectations with regard to converting federal On-prem clients to the SaaS offering. Brian Lee Essex – JPMorgan Chase & Co. – Executive Director of U.S. Software Equity Research asked: "***Great to see the FedRAMP Authorization. I would love to get your sense of how you feel positioned ahead of the stronger third quarter for fed spending how much visibility you might have into that Fed business? And what's your sense of the preparedness on the Fed side to adopt data security versus what you're seeing on the enterprise side?***" Melamed responded:

> Obviously, ***we were very excited to receive the FedRAMP Authorization this quarter***. It really is a great milestone for us. ***We can now offer the SaaS platform to the federal sector, and that's really a big deal from our end. Our team put a lot of time, effort and investment into this achievement. And we know there's a significant white space for us in the federal vertical***.
>
> …
>
> It really is still too early to say if we can have any benefits from the FedRAMP in our Q3 results this year. But ***from a guidance perspective, we assumed a similar contribution to last year. On the longer-term side, we see a huge opportunity in this vertical.***

208. Defendants' statements referenced in ¶¶201-207 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) customers were resisting and outright refusing to convert to SaaS; (ii) the conversion rate was significantly below the Company's prior expectations; (iii) the Company was not merely starting conversion conversations early with customers in anticipation of converting. Rather the Company was converting customer contracts to SaaS prior to the quarter in which they were up for renewal, thereby inflating the current conversion figures and masking that many customers had refused to convert to SaaS and the remaining customers were heavily weighted toward resistant and refusing customers; (iv) the Company was converting customers to SaaS at zero price uplift; (v) customers only had the option to convert to SaaS – they could not renew their on-premises contract; (vi) many federal customers (which were primarily up for renewal in Q3 2025), especially those in the DoD, would never convert to SaaS and would have to go to a competitor because Varonis did not have and would never have sufficient FedRAMP certification level and would not renew on-premises contracts; and (vii) as a result, the Company's guidance lacked any reasonable basis.

*September 3, 2025*

209. On September 3, 2025, Melamed and Gibson participated in Citi's 2025 Global Technology and GEMS Conference. Melamed indicated that that the conversion of On-prem

customers to SaaS was going even better than previously expected, so much so that it caused Defendants to increase the FY 2025 guidance. Specifically, Fatima Boolani with Citibank asked Melamed about the status of the conversion: "How much more of a transition effort remains?":

> ***So at the end of Q2, we increased the SaaS mix guidance to 82%.*** So we expect to finish the year with an 82% SaaS mix. Again, ***within three years moving very, very quickly***. The one thing ***that's important to note is that Q4 has always been the largest quarter for us where the largest amount of renewals are in play***. And that's obviously one of the lessons we have learned from last year is that ***we're having conversations with those customers that are up for renewal in Q4***.
>
> ***We started those conversations in Q1 earlier than usual*** in terms of the benefits of SaaS, why it's a much better product. ***The reception that we're getting is very, very good. Customers are excited to move to SaaS***. So I think throughout there's still a lot of the base that we need to convert. But from a commission perspective, this is the year of transition. ***As we kind of exit the year with an 82% SaaS mix, which is the guidance, or if we can do better than that, that doesn't leave a lot of customers to convert.***
>
> …
>
> But ***if I look at the enterprise business***, we're very much in conversations with the one that haven't converted. And I think that it's extremely, we've been extremely focused on kind of moving as quickly as we can. And then ***the reception of our customers has been great.***

210. Melamed also addressed conversion of federal customers, stating that the Company's receipt of the FedRAMP certification would allow federal customers to convert to SaaS:

> ***The one element that is actually worth talking about is that a lot of the ones that haven't converted are state and government. And we received our FedRAMP certification in the last couple of weeks, which is, it was a lot of effort to get it. It was a big investment, both from a monetary perspective and from a time perspective. But it was definitely worth it from our perspective, because now we can go to our state and government customers and show them that they can move to SaaS with that FedRAMP certification***.

211. Defendants' statements referenced in ¶¶209-210 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) customers were resisting and outright refusing to convert to SaaS; (ii) the conversion rate was

significantly below the Company's prior expectations; (iii) the Company was not merely starting conversion conversations early with customers in anticipation of converting. Rather the Company was converting customer contracts to SaaS prior to the quarter in which they were up for renewal, thereby inflating the current conversion figures and masking that many customers had refused to convert to SaaS and the remaining customers were heavily weighted toward resistant and refusing customers; (iv) the Company was converting customers to SaaS at zero price uplift; (v) customers only had the option to convert to SaaS – they could not renew their on-premises contract; (vi) many federal customers (which were primarily up for renewal in Q3 2025), especially those in the DoD, would never convert to SaaS and would have to go to a competitor because Varonis did not have and would never have sufficient FedRAMP certification level and would not renew on-premises contracts; and (vii) as a result, the Company's guidance lacked any reasonable basis.

## V. THE TRUTH BEGINS TO EMERGE AS DEEFENDANTS CONTINUE TO MISLEAD INVESTORS

*October 28, 2025*

212. On October 28, 2025, Defendants released their third quarter results well below their previous projections and lowered their full-year guidance:

**Financial Summary for the Third Quarter Ended September 30, 2025**

- Total revenues were $161.6 million, compared with $148.1 million in the third quarter of 2024.
- SaaS revenues were $125.8 million, compared with $57.8 million in the third quarter of 2024.
- Term license subscription revenues were $24.8 million, compared with $68.8 million in the third quarter of 2024, with the vast majority of the decline driven by customers converting to our SaaS platform.
- Maintenance and services revenues were $10.9 million, compared with $21.5 million in the third quarter of 2024, with the vast majority of the decline driven by customers converting to our SaaS platform.
- GAAP operating loss was ($35.9) million, compared to GAAP operating loss of ($23.6) million in the third quarter of 2024.

- Non-GAAP operating income was $0.2 million, compared to non-GAAP operating income of $9.1 million in the third quarter of 2024.

…

**Financial Outlook**

We are reducing our full-year ARR guidance to account for the underperformance of our on-prem subscription business in the final weeks of the third quarter. To account for this recent change as well as our decision to end of life our self-hosted solution, we have assumed an even lower renewal rate in our on-prem subscription business for the fourth quarter.

For the fourth quarter of 2025, the Company expects:

- Revenues of $165.0 million to $171.0 million, or year-over-year growth of 4% to 8%.
- Non-GAAP operating income of $0.0 million to $3.0 million.
- Non-GAAP net income per diluted share in the range of $0.02 to $0.04, based on 133.4 million diluted shares outstanding.

For full year 2025, the Company now expects:

- ***ARR of $730.0 million to $738.0 million, or year-over-year growth of 14% to 15%***.
- Free cash flow of $120.0 million to $125.0 million.
- Revenues of $615.2 million to $621.2 million, or year-over-year growth of 12% to 13%.
- Non-GAAP operating loss of ($8.2) million to ($5.2) million.
- Non-GAAP net income per diluted share in the range of $0.12 to $0.13, based on 134.8 million diluted shares outstanding.

213. In the earnings release, Faitelson further elaborated on the reasons for the shortfall, attributing it to the "***final weeks of the quarter***" where Varonis "***experienced lower renewals in the Federal vertical and in our non-Federal on-prem subscription business, which led to a shortfall relative to our expectations***."

214. During the corresponding earnings call, Faitelson highlighted Varonis' disappointing results and the reason for the full-year projection reduction, stating, in pertinent part:

Let's start by reviewing our third quarter results. ARR increased 18% year-over-year to $718.6 million. ***However, in the final weeks of the quarter, we experienced weaker-than-expected renewals in our federal business in our non-federal on-prem subscription business, which resulted in Q3 coming below our expectations***.

As a result of continued underperformance in the federal vertical, we will be reducing the size of the team until we see improvement.

***Now that we have completed our SaaS transition, we are now announcing the end of life of our self-hosted solution as of December 31, 2026. We expect this to result in increased uncertainty with our remaining OPS business going forward. In each of the first 2 quarters of this year, we saw improvement in our gross renewal rate across the business, which is why the reduction in the renewal rate that happened in the final weeks of Q3 was unexpected.***

***To account for this recent change as well as our decision to end of life our self-hosted solution, we are baking in additional conservatism to our guidance and have assumed even lower renewal rates in our OPS business for the fourth quarter***. We are also taking thoughtful and prudent steps to manage expenses across the business, which ***includes a 5% reduction in headcount*** in order to reallocate our resources where we see the highest return on investment.

215. Defendant Melamed elaborated more particularly as to the financial details of the setback and the reduced guidance, pertinently providing the following:

I will expand on this shortly, but let me first recap our Q3 results and update guidance. In the third quarter, ARR increased 18% year-over-year to $718.6 million. ***Our quarterly results did not meet our expectations due to weaker-than-expected renewals in our federal and nonfederal on-prem subscription business in the final weeks of the quarter***.

***In each of the first 2 quarters of this year, we saw an improvement in our gross renewal rates across the business, which is why the reduction in the renewal rate in the final weeks of Q3 was unexpected. Since it is unclear if this reduction is specific to the customers that were up for renewal in Q3 or will be applicable to the population of remaining on-prem subscription customers, we have assumed a lower renewal rate in the fourth quarter and expect continued variability in our on-prem renewal rate going forward.***

As it relates to our guidance, we are now baking in additional conservatism for the fourth quarter to account for our weaker Q3 results and the decision to end of life our self-hosted solution.

…

Turning now to our updated 2025 guidance in more detail. For the fourth quarter of 2025, we expect total revenues of $165 million to $171 million, representing growth of 4% to 8%. Non-GAAP operating income of breakeven to $3 million and non-GAAP net income per diluted share in the range of $0.02 to $0.04. This assumes 133.4 million diluted shares outstanding.

> For the full year 2025, we now expect ARR of $730 million to $738 million, representing growth of 14% to 15%. Free cash flow of $120 million to $125 million. And total revenues of $615.2 million to $621.2 million, representing growth of 12% to 13%. Non-GAAP operating loss of negative $8.2 million to negative $5.2 million. Non-GAAP net income per diluted share in the range of $0.12 to $0.13. This assumes 134.8 million diluted shares outstanding.

216. During the question-and-answer segment that followed, Defendants detailed the potential inability to convert some of its existing On-prem users to the SaaS offering and how that impacted Varonis' projections. Joshua Alexander Tilton – Wolfe Research, LLC – Senior Vice President asked: "I'm still a little confused on the why…[W]hat was the reason as to why you saw some of these lower-than-expected renewals in the on-prem business, both for Fed and non-Fed?..[O]n the non-Fed side, were these customers aware that the end of life was going to happen? Or is this announcement of end of life kind of post-quarter, if that makes sense?" Completely ignoring the question about whether customers were aware that the end-of-life was going to happen, Melamed responded:

> So really, ***as it relates to this quarter, we really saw multiple factors that came up, but we didn't identify any big theme that relates to our customers that did not renew on the on-prem subscription renewals.***
>
> ***I think we identified sales process issues on the convergence that weren't related to the contracts and the documentations that we've talked a lot about in the past, and we are going back to basics to address these issues. We also identified and we are seeing some additional budgetary scrutiny from customers this quarter. But it's really hard to say for certain if that was a factor because it happened so late in the quarter***.

Faitelson likewise ignored the question about whether customers were aware that the end-of-life was going to happen, instead responding:

> And with some of them, it was clear that they were what we call single threaded that did some classification and audit and didn't do all the find, fix, alert methodology. ***And in some cases, the teams just -- the heart of the sales process is a POC and then QBR that showed the value and an EBC that showed everything that we have in terms of road map and so forth and some teams didn't really follow this methodology.***

217. Rudy Grayson Kessinger – D.A. Davidson & Co. – MD & Senior Research Analyst followed up on the unanswered end-of-life issue and made the connection identified by the FEs and which Defendants already knew – that telling On-prem customers that they must convert to SaaS or leave alienated customers, asking:

> It's kind of been asked. But I'm just curious, the end of life for self-hosted by the end of next year, and you just had lower renewal rates than you were expecting in Q3. I mean, do you feel at all that this push to migrate to SaaS is in any way alienating a certain portion of your customers who are just never going to move to SaaS?

Melamed responded:

> And if you go back to conversations that we've had, we always said that we don't want to maintain 2 types of code, that there are a ton of financial benefits for the organization to be only under SaaS.
>
> …
>
> And obviously, the on-prem subscription renewals acting the way they did in Q3. So that's -- we would have announced the end of life. ***That was our plan all along. But obviously, with what we see in Q3, we kind of expedited that announcement***, but really talking about December -- end of December of next year. And we will work with our customers to make sure that they can move to SaaS and benefit from it.

218. Roger Foley Boyd – UBS Investment Bank – Analyst similarly asked: "[W]e had heard some anecdotes that you were maybe more heavily encouraging on-prem customers to move to SaaS or in some cases, living in the ability for customers to renew on maintenance. And just wondering if that at all was informed by this planned end-of-life on-prem business." Melamed again denied that there were any signs of resistance by on-prem customers to converting to SaaS:

> So again, going back to kind of the reasons for the lower renewal rate of the on-prem subscription, we just saw multiple factors. I don't think there was any one big theme that we can pinpoint to the reason of the on-prem subscription renewals behaving the way they were, especially when you look at the Q1 and Q2 renewal rates where the -- ***when you look at the renewal rate of the company going up in Q1 and Q2, we definitely didn't expect that the Q3 renewals of the on-prem subscription would behave that way***.

> I think that when you go back -- if you go back historically, ***our sales force has been trying to convert customers in discussions with our customers for -- since we announced the transition***. We were able to move as quickly as we have because our reps were discussing this with customers. We obviously believe that the benefit of having SaaS and MDDR has much greater value for our customers than being on the on-prem subscription and then having those customers manage the platform themselves.
>
> So obviously, I don't know what you heard, but our sales team has been working with customers, and we'll continue to work with our customers to make sure that they get the best platform that we have to offer, which is the SaaS plus the MDDR and all the functionalities that we have under SaaS that we don't have with the on-prem subscription.
>
> I think that as we look at the results in Q3, we see a very healthy business under the SaaS platform. And obviously, ***the on-prem subscription acted in a way that surprised us***, which is part of the reason that we want to be 100% SaaS by the end of next year. So this -- I don't see this as something that is different in Q3 compared to Q2.
>
> ***I think there were multiple factors that contributed to kind of the lower renewal rate of the on-prem subscription. We talked about the sales process issues. We talked about additional budgetary scrutiny. Obviously, we talked about the federal underperformance***. But as I said before, there was one thing that was clear to us, and that was that we didn't see a change in the competitive win rates, and ***we're still in discussions with some of those customers that didn't renew***.
>
> ***So we think we might be able to get some of them back***. We're in discussions with them. But obviously, we -- from a guidance perspective, we're assuming a more conservative guidance for Q4 because of the rates that we saw in Q3.

219. Jason Noah Ader – William Blair & Company LLC – Partner & Co-Group Head of Technology, Media and Communications asked:

> So if customers are not renewing their on-prem subscriptions with Varonis and not going to your SaaS, then what are they doing? Because obviously, you wouldn't think they'd want to be exposed if they've had Varonis data protection and all of a sudden, they don't have access to the technology anymore.
>
> So maybe just talk us through that, like what are they doing? And then separately, is term -- is there an element of compression in term contract duration at all because we saw that with another software company this morning where they saw some compression in term duration.

Melamed responded:

> So let me address the first question and then I'll tackle the second one. When we look at those on-prem subscription renewals, most of them didn't go anywhere. And as I said before, we're in discussions with some of them. For many of these customers, they were single threaded, meaning they were only protecting on-prem data with a single use case, and they weren't using the full platform that we have with our SaaS offering. ***Historically, we converted these customers without many challenges.***
>
> ***But in Q3, we encountered some of these issues and really can't really tell if it was a one-off or a new trend. And that's part of the reason that we want to see how Q4 behaves in order to get more color on kind of the rest of the non-SaaS business***. In terms of the duration, that wasn't an impact here. We looked at that and analyzed that, and it didn't have an impact.

220. Michael Joseph Cikos – Needham & Company, LLC – Senior Analyst questioned Defendants explanation of how the renewals in Q3 could unexpectedly drop in just the last couple weeks of the quarter and why the Company would expect that trend to continue for contracts up for renewal in Q4 (unless, of course, the Company had been pulling forward conversions and leaving only the resistant and refusing customers for Q3 and Q4):

> I'm trying to get a sense if there was anything unusual about this OPS renewal cohort in the final weeks of the third quarter. And really, what I'm trying to get at is I'm wondering if the renewal rates was really tied to a smaller subset of customers, i.e., the breadth of customers really skewed to the renewal rates that we're talking to.
>
> And does that in any way help explain why the team is uncertain on the impact of these renewal rates, maybe just because we don't have enough observed data points. And then, I guess, secondly, have the OPS renewal rates that we saw on those final weeks of Q3? Have they persisted in the 4Q now that we have October, essentially behind us? I'm just trying to get a sense of what's transpired in the following 4 weeks.

Melamed avoided the question, contradicting his prior statements that information in the first half of a quarter (i.e. Q3) can indicate that conversions are on track:

> ***It's very hard to see how the renewal rate will behave in Q4 when you own the data points that we have sitting here today. And if you go back to Q3, the business was tracking on plan, but really it was only in the final 2 weeks of the quarter that we experienced a decline in our renewal rate for the on-prem subscription business, which related really to both the federal and nonfederal sectors. So it's very hard for us to bake in any assumptions.***

> And from a guidance perspective, we have never baked in positivity before we see it come to fruition. We always assume either the trend continues or gets worse, which is what we did in this case of the guidance. ***In our Q4 guidance, we assumed lower renewal rates that would take into consideration not just what we saw in Q3, but some of the impact of the announcement of end of life for our on-prem subscription business.***

Faitelson acknowledged that smaller On-prem customers had been a group that had refused to convert:

> There's no one thing. There is no one plan. But in some cases, definitely, there are account -- basic account management problems that customers use a small subset of the platform and our reps assumed like in other situation, they automatically will move into SaaS for the full hybrid complete.

221. Defendants further discussed impacts to the federal on-prem business. Meta A. Marshall – Morgan Stanley – Vice President asked why the Company was reducing it federal business headcount when the Company had just received its FedRAMP and indicated that would allow for conversion of federal business to SaaS: "[Y]ou guys had just received ***FedRAMP high authorization*** for the SaaS platform. And so I guess just what went into kind of some of the decision to kind of terminate some of the people on the federal team. And just how do you kind of pursue that opportunity going forward?" Faitelson gave the first indication that the Company's FedRAMP certification was not high enough for many of the Company's federal customers (and that the Company never intended to expend the resources to get a higher certification to convert and maintain those customers. However, Faitelson continued to deny any knowledge as to why conversions of the federal business failed:

> ***We have the FedRAMP moderate, but we just don't have just the empirical evidence that in terms of when we're looking at all of the investment, this is the place that we need to invest in.*** We said all along that it doesn't behave like the enterprise business. ***And we haven't figured out why the federal continued to underperform. It's just the result, we are reducing the footprint of our federal team and just grouping and reevaluating the strategy there***.

222. Erik Loren Suppinger – B. Riley Securities, Inc. – Research Analyst asked: "Just can you remind us what your contribution from Fed was and maybe what the contribution from the on-premises Fed business because I think all the Fed is probably on-premise. And then you've specifically identified both your Fed on-prem and the non-Fed on-prem. Was there a difference in terms of the decline in renewal rates between those 2 categories? Or were they both down similarly?" Melamed responded:

> So federal business has always been around 5% of our total ARR. ***And when we look from a guidance perspective going into Q3, we basically assumed a flat contribution going into the quarter, but we actually had a headwind related to the federal business that was really coming from the renewals in the federal business.*** And we had ***several million dollars of a headwind coming from the federal business***, which is kind of why we're making the adjustments to the team.
>
> But when you look at the renewals, there were actually -- ***the renewal rate decline was both on the federal side and also on the nonfederal side, which is the reason that we're reducing our Q4 numbers. If it was only the federal, I don't think we would have adjusted the full year guidance the way we did***.

223. Defendants' statements referenced in ¶¶213-222 were materially false and misleading because well before Q3 2025 Defendants knew or recklessly disregarded but failed to disclose that (i) customers were resisting and outright refusing to convert to SaaS; (ii) the conversion rate was significantly below the Company's prior expectations; (iii) the Company was not merely starting conversion conversations early with customers in anticipation of converting. Rather the Company was converting customer contracts to SaaS prior to the quarter in which they were up for renewal, thereby inflating the current conversion figures and masking that many customers had refused to convert to SaaS and the remaining customers were heavily weighted toward resistant and refusing customers; (iv) the Company was converting customers to SaaS at zero price uplift; (v) customers only had the option to convert to SaaS – they could not renew their on-premises contract; (vi) many federal customers (which were primarily up for renewal in Q3 2025), especially those in the DoD, would never convert to SaaS and would have to go to a

competitor because Varonis did not have and would never have sufficient FedRAMP certification level and would not renew on-premises contracts; and (vii) as a result, the Company's guidance lacked any reasonable basis. While Defendants could not mask the financial results in Q3 2025 or the need to drastically reduce guidance for Q4 and FY 2025, they misled investors as to the reason for miss and reduction. Moreover, the need to drastically reduce guidance for Q4 and FY 2025 is not consistent with Defendants' asserted reasons that contracts purportedly up for renewal in Q3 did not convert to SaaS as it provides no rationale why the contracts up for renewal in Q4 2025 would perform even worse. However, such reduction in guidance is completely consistent with Plaintiffs' theory of liability.

224. Investors and analysts reacted immediately to Varonis' revelation. The price of Varonis' common stock declined dramatically. From a closing market price of $63.00 per share on October 28, 2025, Varonis' stock price fell to $32.34 per share on October 29, 2025, a decline of about 48.67% in the span of just a single day.

225. A number of well-known analysts who had been following Varonis lowered their price targets in response to Varonis' disclosures. For example, Piper Sandler, while reiterating their neutral rating and slashing their price target more than 28.5% summarized that "In what was perceived as a fairly de-risked 2H setup, lower on-prem renewals (both Federal & commercial) drove a $1M miss to 3Q ARR, a $17M lower to full-year ARR expectations and a 5% RIF as the company realigns expectations and resource allocation in light of results." The analyst went on to note that "given limited confidence from management on this being a one quarter issue, we expect the stock to remain range bound until further detail is understood, especially in light of the announced on-prem EoL."

226. Similarly, Baird, while downgrading to a neutral position, highlighted the Varonis' "reset in visibility [and] execution," on the back of an "unexpected Q3 renewal shortfall in both federal/non-federal on-prem subs (~24%) prompted a notable ARR guidance cut and headcount reduction." The analyst further noted that Varonis' "hard end-of-life stance on self-hosted by 2026 further adds incremental execution complexity" and the "[r]isk/reward now skews more balanced." Pertinently, the analyst also highlighted the federal weakness specifically, noting renewals "were weaker than expected in the final weeks of Q3," and, as a result, "VRNS is downsizing its federal sales-team due to persistent underperformance in the vertical."

227. Further, Barclays, while retaining its overweight rating alongside a 29% cut to its price target, highlighted "3Q NNARR of $25M was well below expectations" and "reported ~$25M in 3Q net new ARR [was] $5-10M below the upside expectation of $33M that we previewed, and also below VRNS' internal expectations for the quarter." The analyst stated it was "a head-scratcher because renewal rates for on-prem were actually up y/y in 1H25" and noted "[t]his surprised us since renewal rates for on-prem subscription improved in 1Q and 2Q, so we didn't expect churn to pick up meaningfully this quarter."

228. A D.A. Davidson analyst report seemed to believe that Defendants' explanations did not make sense and that the Company had been pulling in conversions from Q3 and Q4 to bolster the reported Q1 and Q2 conversion figures: "Mgmt. ***seemingly*** did not discover a common theme for the increased churn, though ***we believe it is due to the aggressive push to get on-premise customers to migrate to SaaS***…***[W]e have seen consistent upticks in the % of remaining on premise customers who feel like they are being forced to migrate in our channel surveys***."

229. The fact that these analysts, and others, discussed their surprise at Varonis' shortfall and below-expectation projections suggests the public placed significant weight on Varonis' prior

revenue and sales estimates as they related to on-prem conversions. The frequent, in-depth discussion of Varonis' ARR guidance confirms that Defendants' statements during the Class Period were material.

*February 3, 2026*

230. On February 3, 2026, after the market closed, Varonis issued a press release announcing 4Q 2025 and full-year 2025 financial results as well as Q1 2026 and full-year 2026 guidance.

> **Financial Outlook**
>
> For the first quarter of 2026, the Company expects:
>
> - SaaS ARR year-over-year growth of 27% to 28%, excluding conversions.
> - Revenues of $164.0 million to $166.0 million, or year-over-year growth of 20% to 22%.
> - Non-GAAP operating loss of ($11.0) million to ($10.0) million.
> - Non-GAAP net loss per basic and diluted share in the range of ($0.06) to ($0.05), based on 118.0 million basic and diluted shares outstanding.
>
> For full year 2026, the Company expects:
>
> - ***SaaS ARR of $805.0 million to $840.0 million, or year-over-year growth of 26% to 32%.***
> - SaaS ARR year-over-year growth of 18% to 20%, excluding conversions.
> - ***Free cash flow of $100.0 million to $105.0 million***.
> - Revenues of $722.0 million to $730.0 million, or year-over-year growth of 16% to 17%.
> - Non-GAAP operating income of $0.0 to $4.0 million.
> - Non-GAAP net income per diluted share in the range of $0.06 to $0.10, based on 134.2 million diluted shares outstanding.

231. During the earnings call that followed the same day, Melamed stated as to the FY 2026 guidance:

> We believe this range of conversions captures a pessimistic and optimistic scenario with a midpoint representing our base case for 2026. ***From a modeling perspective, we have assumed no uplift for these conversions***. ***The largest cohort of customers that we don't expect to convert to SaaS are federal and state government***

> ***customers. As a reminder, we expect this to have a $30 million to $50 million headwind to free cash flow and ARR contribution margin in 2026*.**

232. Investors and analysts reacted immediately to Varonis' revelation. The price of Varonis' common stock declined dramatically. From a closing market price of $26.53 per share on February 3, 2026, Varonis' stock price fell to an opening price of $23.17 on February 4, 2026, and closed at $23.67 on February 4, 2026, a decline of about 10.78% in the span of just a single day.

233. As a February 4, 2206 Morgan Stanley analyst report stated, these disclosures "came as a surprise to investors": "Market reaction more negative to FQ4 earnings, as more concerned in the near term with a FCF outlook that was short of expectations. Varonis noted a $30-50mm headwind in CY26 from a lower renewal rate on the non-SaaS business as a result of the end-of-life announcement. While this is largely an output from business it had said likely would renew, it still came as the biggest shock on the quarter to investors."

234. A February 4, 2026 Needham analyst report similarly stated: "projected Non-SaaS ARR churn of roughly $30 Million to $55 Million should create an unexpected headwind to CY26 Free Cash Flow, resulting in a guide of $102.5 Million at the midpoint - below the sell-side forecast of $151.0 Million" and "The substantially lower Renewal rates from Non-SaaS ARR should serve as a drag on both ARR Contribution Margin and Free Cash Flow in CY26."

235. A February 4, 2026 RBC Capital Markets analyst report noted "Management expects Fed and local gov't to be the most likely to churn off and not convert to SaaS."

236. After the Class Period, during the Company's May 19, 2026 Q1 2026 earning call, Defendants finally acknowledge that the Company had been converting On-prem customers to SaaS with no price "uplift" but claiming it was a recent phenomenon. Melamed stated: "

> You're right. I think the way we have treated the conversions definitely changed post Q3 of 2025. I think when we look at some of the lessons learned from that

> quarter is that ***some of the customers that were left in the bucket that haven't been converted where apart from being federal and state and government that some of them will never move to SaaS. They are the single-threaded customers that wouldn't necessarily rush to convert to SaaS. And we have kind of changed our mindset as to the fact that we would like to get customers to move even at a flat rate*** and then show them value with the understanding that we can get additional uplifts. That's definitely been the case in Q4 and Q1, and I expect that to continue for the rest of the year.

## VI. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

237. At all relevant times, the market for Varonis' common stock was an efficient market for the following reasons, among others:

a) Varonis' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market; Varonis communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

b) Varonis was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

c) Unexpected material news about Varonis was reflected in and incorporated into the Company's stock price during the Class Period.3

238. As a result of the foregoing, the market for Varonis' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Varonis' stock price. Under these circumstances, all purchasers of

Varonis' common stock during the Class Period suffered similar injury through their purchase of Varonis' common stock at artificially inflated prices, and a presumption of reliance applies.

239. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## VII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

240. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with ARR projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

241. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

242. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was

authorized and/or approved by an executive officer of Varonis who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

243. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Varonis' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

244. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Varonis' common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Varonis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 24, 2025, there were 117.897 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by

thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

245. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

246. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

247. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Varonis;

c) whether the Individual Defendants caused Varonis to issue false and misleading financial statements during the Class Period;

d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e) whether the prices of Varonis' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

248. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

***Against All Defendants for Violations of***
***Section 10(b) and Rule 10b-5 Promulgated Thereunder***

249. Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

250. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

251. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Varonis' common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Varonis' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

252. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Varonis' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

253. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

254. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Varonis' internal affairs.

255. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As

officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Varonis' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Varonis' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Varonis' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

256. During the Class Period, Varonis' common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Varonis' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Varonis' common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Varonis' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

257. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

258. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

***Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act***

259. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

260. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Varonis' misstatements.

261. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Varonis which had become materially false or misleading.

262. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Varonis disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their

power and authority to cause Varonis to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Varonis' common stock.

263. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Varonis to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

264. By reason of the above conduct, the Individual Defendants and/or Varonis are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 17, 2026

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com

***Counsel for Lead Plaintiffs and the Class***